UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
 **-------------------------------------------------------------------- X**

LYDIA GONZALEZ DIAZ, VANESSA WALSH,
NINA CRAWFORD, SAMANTHA COLEMAN,
MILTON CRUZ, MARYANNE HAYES, WILLIAM
HEARN, FRANCISCO HERNANDEZ, GAIL JONES,       Case No. 2-cv-2051
MARC POLITE, RALPH WAITERS, LATRINA
WILLIAMS, LINDA BOLTON, MILTON CRUZ,          **VERIFIED CLASS**
SHARON HOSKINS, JOVAN JOHNSON, REINA          **ACTION COMPLAINT**
VASQUEZ, SONYA TAVARAS, and STEVEN
TAVAREZ, on behalf of a class of similarly situated
tenants of the New York City Housing Authority at
Harlem River Houses,

                          Plaintiffs,

              -against-

UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT, NEW YORK CITY
HOUSING AUTHORITY, HARLEM RIVER
PRESERVATION LLC, and C+C APARTMENT
MANAGEMENT, LLC,

                          Defendants.

 **-------------------------------------------------------------------- X**

        Plaintiffs, as and for their Complaint, by their attorneys, Advocates for Justice, allege

as follows:

                          **PRELIMINARY STATEMENT**

        1.      This is an action for injunctive relief addressed to the approval by the defendant

United States Department of Housing and Urban Development ("HUD") of the conversion of

Harlem River Houses from a Public Housing Authority development funded by Section 9 of the

Housing Act of 1937 to a privately owned and managed development corporation functioning

under Section 8 of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et*

*seq.* Harlem River Houses, as we commence suit, is owned and managed by the New York City Housing Authority ("NYCHA"), which has turned to a privatization program to address its inability to perform its responsibilities as a property manager under Title 9. NYCHA has done such a poor job that HUD sued NYCHA in 2018 seeking to have a Federal Monitor installed to run NYCHA. That lawsuit, and a subsequent Consent Decree which the District Court has refused to approve, has not improved the situation at NYCHA. In fact, on February 6, 2022, NYC Housing Judge Kimon Thermos, addressing the failure of NYCHA to provide heat and hot water to a development in Queens, despite his earlier order that they do so, stated to NYCHA's counsel: "If this was a private small landlord he [the landlord] would be in jail by now… and the fines would have been $500 per day, per apartment. So he would have been in jail and he would have been losing his building too. Why is your crime shielded this way," Thermos asked a NYCHA lawyer. "NYCHA is dropping the ball big time here." This was followed by NYC Mayor Eric Adams stating: "There's a culture of incompetence that has permeated NYCHA. And I think it has a lot to do that people are not respecting the rights of those residents, When I saw that story that was in the paper, that is unacceptable."

2.      But failing housing authorities are not permitted by Federal law and regulation, to participate in the conversion program. Continued efforts by the New York City Housing Authority ("NYCHA") to force their tenants at Harlem River Houses into a program which would require them to give up their leases with NYCHA and sign new leases with C+C Apartment Management, LLC ("C+C") under a privatization program called Permanent Affordability Commitment Together ("PACT"), which NYCHA and HUD assert is authorized under a Federal program called Rental Assistance Demonstration ("RAD"). Under current HUD Regulations (see H-2019-09 PIH-2019-23(HA), Rental Housing Assistance REV-4 – Final

Implementation), **to be eligible for a RAD conversion a PHA must be "classified as a Standard or High Performer under the Public Housing Assessment System… If classified as 'troubled'** … the PHA may still be eligible if it is making substantial progress under its Recovery Agreement, Action Plan, Corrective Action Plan, or Memorandum of Agreement or proposes a revision to such agreement or plan that incorporates conversion under RAD and that is acceptable to HUD.

3.      In 2018, in a case titled *United States of America v. NYCHA*, 18 Civ 5213 (SDNY) (annexed, without exhibits, as Exhibit A), the United States made the following allegations about NYCHA, none of which NYCHA has ever denied:

a.      The New York City Housing Authority ("NYCHA") violates basic health and safety regulations of the U.S. Department of Housing and Urban Development ("HUD"). These regulations require NYCHA to protect children from the lead paint that is present within apartments in roughly thirty percent of NYCHA developments and, more generally, to provide residents decent, safe, and sanitary housing. NYCHA has repeatedly made false statements to HUD and the public regarding these issues, and has deceived HUD inspectors.

b.      The people who suffer as a result of NYCHA's misconduct are its residents, including lead-poisoned children; elderly residents without heat in winter; asthma sufferers whose condition is worsened by moldy and pest-infested apartments; and disabled residents without functioning elevators.

c.      Lead is toxic, and there is no safe level of exposure; in children, lead can have devastating effects. The most common cause of lead poisoning in children is exposure to deteriorated lead paint. NYCHA knows that there is lead paint within apartment units in roughly thirty percent of its developments, but has failed—and continues to fail—to protect its residents

from that paint when it peels and crumbles. NYCHA has for years failed to follow key HUD lead paint safety regulations including, among other things, by failing to find and remediate peeling lead paint in its developments and failing to ensure that NYCHA's workers use lead-safe work practices to avoid disturbing lead paint that might injure residents. Since at least 2011, NYCHA senior managers have known that NYCHA was violating HUD lead paint requirements. Beyond HUD's requirements, NYCHA has also violated lead paint safety regulations promulgated by the U.S. Environmental Protection Agency ("EPA").

        d.     Children have been harmed as a result of NYCHA's failures. Between 2010 and 2016, at least 19 lead-poisoned children were found to have been exposed to deteriorated lead paint in their NYCHA apartments. These 19 children are at risk of lifelong neurological problems. But the 19 cases understate the true extent of lead poisoning likely to have been caused by crumbling lead paint at NYCHA. Many hundreds of additional children living at NYCHA have been reported to the New York City Department of Health and Mental Hygiene ("NYC DOH") as having tested at or above the Centers for Disease Control's "reference level"—the level at which public health actions should be initiated. But NYC DOH is only able to investigate a fraction of the cases reported to it to determine whether the children's apartments contain peeling lead paint. Moreover, NYC DOH's information is incomplete because it is based solely on reports from medical professionals who have tested children for lead, and does not include the many children living at NYCHA who have not been tested but nonetheless may have lead poisoning. There is every reason to believe the true number of children with lead poisoning is materially higher.

        e.     Beyond lead paint, HUD regulations also require NYCHA to provide "decent, safe, and sanitary" housing. This "decent, safe, and sanitary" regulation requires not

only that NYCHA comply with lead paint safety rules but also that it provide an environment free of mold and pest infestations and with adequate heat and functional elevators. Every year, NYCHA certifies that it is in fact complying with HUD's regulations, and HUD has paid NYCHA billions of dollars to operate in compliance with them.

        f.     To enable HUD to determine whether public housing meets this basic standard, HUD created an inspection regime—the Public Housing Assessment System—to allow HUD to determine whether a housing agency is providing decent, safe, and sanitary housing. NYCHA has undermined HUD's inspections by disguising the true condition of its properties. This deception included turning off water to developments to prevent HUD inspectors from observing leaks; posting "danger" signs to keep inspectors away from troubled areas; and temporarily hiding improperly stored hazardous materials. NYCHA management even included a document with suggestions for deceiving inspectors in NYCHA's official training materials. This cover-up "how-to" guide was only removed in Summer 2017, after this office called its existence to the attention of NYCHA's outside lawyers.

        g.     NYCHA's conduct undermined HUD's inspection regime and HUD's ability to use that regime to determine whether NYCHA complies with the "decent, safe, and sanitary" requirement. In fact, living conditions at NYCHA are far from "decent, safe, and sanitary." Mold grows unchecked at many NYCHA developments, often on a large scale. Across the City, residents are provided inadequate heat in winter, leading to frigid apartment temperatures. Pests and vermin infestations are common, and as senior New York City officials have acknowledged, NYCHA "has no idea how to handle rats." Elevators often fail, leaving elderly or disabled residents trapped in their apartments or sleeping in building lobbies because

they cannot return to their homes. Leaks, peeling paint, and other deterioration are commonplace, but go unaddressed.

        h.      NYCHA is well aware that disclosing its failure to protect residents from lead paint and its failure to provide decent, safe and sanitary housing would lead to unwanted regulatory scrutiny—including potential limitations on future HUD funding. To avoid this, NYCHA hid conditions from inspectors and repeatedly made false statements to HUD and the public to cover up what can be covered up and minimize what cannot. NYCHA's false statements have occurred both in formal submissions to HUD and in letters, emails, and press releases directed at HUD and the public.

        4.      NYCHA has announced to the tenants of Harlem River Houses that HUD has approved the conversion effective February 18, 2022. *See* Exhibit B. This means that HUD has determined either that NYCHA, less than four years after making these horrific allegations, has a "high performer," or that it has made "substantial progress" under its 2018 un-court-approved Consent Decree with NYCHA. Either determination would be arbitrary and capricious, and in light of Judge Thermos's recent pronouncement, would bear no relationship to reality.

        5.      Additionally, under PL 112-55 (the Continuing Appropriations Act of 2012) as amended by PL 115-141 (the 2018 Amendments), as well as the aforementioned HUD regulations, the law (and HUD) requires ownership of a "Covered Project" by a public or non-profit entity, unless private ownership is needed to facilitate the use of tax credits AND the PHA preserves an interest in the property.

        6.      Although the purported Section 8 landlord is a "not-for profit" LLC known as Harlem River Preservation LLC ("HRP"), it appears that the long-term RAD/PACT landlord will be defendant C+C, which is not a public or non-profit entity, and the agreement HRP has with

6

NYCHA, upon information and belief, leaves little or no genuine interest, supervisory or proprietary in Harlem River Houses with NYCHA.

7.      This complaint asserts that the PACT conversion, approved by HUD at Harlem River Houses, is unlawful because HUD acted arbitrarily and capriciously when it approved HRP and/or C+C as the new owner of Harlem River Houses. Plaintiffs, all residents of Harlem River Houses, seek to reverse the conversion.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant 28 U.S.C. § 1331 because Plaintiffs allege claims that arise under Federal law, and 5 U.S.C. § 704 and 706 because the government's actions are arbitrary and capricious. Venue in this Court is proper because the Plaintiffs reside in New York County, and because the events giving rise to the Plaintiffs' claims occurred in New York County.

## PARTIES

9.      The Plaintiffs here are residents of the Harlem River Houses in Manhattan who have suffered, and will continue to suffer, from NYCHA's failure to provide them with decent and sanitary housing, in complete breach of their Lease Agreements and in breach of the implied warranty of habitability, and they are all Residents whom NYCHA is trying to force into the RAD/PACT program.

10.     Plaintiff VANESSA WALSH resides at 210N W. 153rd Street, Apt. 3B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

11.    Plaintiff NINA CRAWFORD resides at 70 Macombs Place, Apt. 1B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

12.    Plaintiff SAMANTHA COLEMAN resides at 2641 Adam Clayton Powell Blvd., Apt. 1B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

13.    Plaintiff MILTON CRUZ resides at 44 Macombs Place, Apt. 3C, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

14.    Plaintiff LYDIA GONZALEZ DIAZ resides at 211E W. 151st Street, Apt. 2A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

15.    Plaintiff MARYANNE HAYES resides at 46 Macombs Place, Apt. 1A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of

1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

16.    Plaintiff WILLIAM HEARN resides at 220 W. 152nd Street, Apt. 2B, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

17.    Plaintiff FRANCISCO HERNANDEZ resides at 2850 Eighth Avenue, Apt. 6E, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

18.    Plaintiff GAIL JONES resides at 52 Macombs Place, Apt. 1A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

19.    Plaintiff MARC POLITE resides at 211D W. 151st Street, Apt. 3D, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

20. Plaintiff RALPH WAITERS resides at 70 Macombs Place, Apt. 3A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

21. Plaintiff LATRINA WILLIAMS resides at 181 W. 151st Street, Apt. 5C, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

22. Plaintiff LINDA BOLTON resides at 214 West 152nd Street, Apt 1A, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

23. Plaintiff SHARON HOSKINS resides at 21E West 151st Street, Apt 1D, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

24. Plaintiff JOVAN JOHNSON resides at 210N West 153rd Street, Apt. 4D, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of

1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

25. Plaintiff REINA VASQUEZ resides at 190 West 152nd Street, Apt. 4C, New York, NY 10039, a part of the Harlem River NYCHA Housing Development. Said Plaintiff is a NYCHA tenant, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiff has a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

26. Plaintiffs SONYA TAVERAS and STEVEN TAVAREZ reside at 211 F West 151st Street, Apt. 4D, a part of the Harlem River NYCHA Housing Development. Said Plaintiffs are NYCHA tenants, with a lease with NYCHA which was created pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Said plaintiffs have a property interest in the rights created under the Housing Act of 1937, *supra*, also known as "Title 9."

27. Defendant UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT is an agency of the United States Government headquartered at 451 7th Street, S.W., Washington, DC 20410.

28. Defendant NEW YORK CITY HOUSING AUTHORITY ("NYCHA") is a New York State Public Development Corporation, with its headquarters at 90 Church Street, New York, New York 10007, which exists under the Public Housing Law, which provides public housing in New York City under Section 9 of the U.S. Public Housing Act of 1937. It was the first agency in the United States to provide housing for low- and moderate-income residents throughout the five boroughs of New York City. NYCHA also administers a citywide Leased Housing Program under Section 8 of the Housing and Community Development Act of 1978 involving rental apartments. These communities are often referred to in popular culture as

11

"projects," or "developments." They include single and double family houses, apartment units, singular floors, and shared small building units.

29.     The New York City Housing Authority's official (though not complied with) mission is to increase opportunities for low- and moderate-income New Yorkers by providing safe, affordable housing and facilitating access to social and community services. More than 400,000 New Yorkers reside in NYCHA's 325 public housing developments across the City's five boroughs. Another 235,000 receive subsidized rental assistance in private homes through the NYCHA-administered Section 8 Leased Housing Program.

30.     Defendant HARLEM RIVER PRESERVATION LLC ("HRP"), which is included as a necessary party, is a partnership of at least four corporate entities: (a) C+C Apartment Management, LLC, a private property management company which manages thousands of residential units, most of which are funded under the LIHTC; (b) the Settlement Housing Fund, a non-profit developer/owner created in 1971, which has a bevy of high-paid executives, and which received 90% of its funds from "related organizations"; (c) West Harlem Group Assistance, a small non-profit which is half-funded by management fees and half-funded by government grants; and (d) L&M Builders, a multimillion-dollar General Contractor, which is to be the General Contractor at Harlem River Houses. HRP has offices at 247 West 37th Street, 4th floor, New York, New York 10018.

31.     Defendant C+C APARTMENT MANAGEMENT, LLC, which is included as a necessary party, is a private property management company with offices at 1735 Park Ave. #300, New York, New York 10035.

## FACTUAL ALLEGATIONS

### I.    NYCHA's Obligations to Its Residents

32.    NYCHA was created in 1935 with a mission of providing decent, affordable housing for low- and moderate-income New York residents. Today, more than 400,000 New Yorkers reside in one of the 326 NYCHA housing developments in New York (the "NYCHA Developments").[1] Although the NYCHA Developments were built as models of affordable public housing, NYCHA has failed in its responsibilities to its Residents (including Plaintiffs and members of Plaintiffs' class) and allowed the NYCHA Developments to fall into disrepair, rendering such housing unsanitary, dangerous, and often uninhabitable. This is true of the buildings Plaintiffs live in.

33.    In failing to fulfill its mission to its Residents, including Plaintiffs and members of Plaintiffs' class, NYCHA has flagrantly violated numerous contractual, statutory, and common law obligations that it owes to those Residents and subjected those Residents to deplorable living conditions. *See*, generally, the Court's opinion in *United States v. NYCHA*, 347 F. Supp.3d 182 (SDNY 2018).

34.    NYCHA leases units in the NYCHA Developments to the Plaintiffs pursuant to the Lease Agreements,[2] which obligate NYCHA, as a landlord, to fulfill certain duties and responsibilities. Further, Federal Law, set forth, in part, at 42 USC Section 1437, and New York law—both statutory and common law—imposes additional obligations on landlords such as

---

[1] N.Y.C. Hous. Auth., About NYCHA, NYC.GOV, https://www1.nyc.gov/site/nycha/about/about-nycha.page (last visited April 2, 2021).

[2] Citations to "Lease Agmt." refer to a representative Lease Agreement attached hereto as Exhibit C. Because NYCHA uses standard forms for its leases, all of the Lease Agreements signed by Plaintiffs have substantially identical terms.

NYCHA. That NYCHA is a public agency does not immunize it in any way from the contractual terms and laws that apply to it as a landlord.

### A.    NYCHA's Lease Obligations to Its Residents

#### 1.    Specific Lease Agreement Provisions

35.    Under the express terms of its Lease Agreements with the Plaintiffs (see Lease Agreement annexed as Exhibit C), NYCHA has a number of contractual obligations to its Residents, including the obligation to "maintain in good and safe working order and condition electric, plumbing, sanitary, heating, ventilating, and other facilities, and appliances, including elevators, supplied by [NYCHA]." (Lease Agmt. § 12(e)). Other specific provisions of the Lease Agreements also address NYCHA's contractual obligation to provide adequate plumbing and drainage, heat and hot water, safe and secure common areas, effective waste removal, gas, electricity and working appliances. (*See, e.g.*, Lease Agmt. §§ 10, 13.)

36.    Further, under § 14, titled "Hazards to Life, Health or Safety," the lease states, "in the event that the Leased Premises is damaged to the extent that conditions are created which are hazardous to life, health, or safety of the occupants: … (c) the Landlord shall offer standard alternative accommodations, if available, in circumstances where necessary repairs cannot be made within a reasonable time." (Lease Agmt. § 14). "In the event repairs are not made in accordance with (this section), rent shall abate during the period exceeding a reasonable time for repairs in which such repairs were not made." (Lease Agmt. § 14(d)).

#### 2.    Obligations Incorporated from Federal Law

37.    Further, NYCHA is subject to housing and safety standards promulgated by federal, state, and municipal authorities. Since NYCHA's operation of the NYCHA Developments is heavily subsidized by federal funding from the United States Department of Housing and Urban Development ("HUD"), NYCHA is required to comply with federal housing

standards. Every year from 2015 to 2018, NYCHA received more than $1 billion in HUD funding, and in 2019, NYCHA received $994 million in HUD funding for its operating budget and $889 million for its capital program.

38.    Accordingly, NYCHA must comply with, among other things, HUD regulations setting forth standards for public housing (the "Housing Standards"), which require public housing to "be decent, safe, sanitary and in good repair" and set forth several criteria that public housing must meet to satisfy that requirement. *See* 24 C.F.R. § 5.703. Such criteria include, by example, a requirement that "[e]ach [NYCHA] building's domestic water, electrical system, elevators, fire protection, HVAC, and sanitary system must be free of health and safety hazards, functionally adequate, operable, and in good repair." *Id.* § 5.703(d)(1).

39.    NYCHA is obligated to its tenants, under a Consent Decree with HUD entered into in 2018, in *United States v. NYCHA* (Exhibit D), to pursue a series of repairs and reforms to procedural scheduling and reporting of those repairs. That Consent Decree, though in effect, has not been approved by the Court in *United States v. NYC Housing Authority*, 18 Civ 5213 (SDNY, Pauley, J); *see United States v. NYC Housing Authority*, 347 F. Supp.3d 182 (SDNY 2018), and has barely been complied with, whether it be at Harlem River Houses or elsewhere.

### 3.  Obligations Incorporated from State Law

40.    In addition, the Lease Agreements (and the Housing Standards (24 C.F.R. § 5.703(g)) also expressly require NYCHA "[t]o comply with all applicable laws, rules and regulations" of any "state … agencies." Such laws include New York's comprehensive Multiple Dwellings Law ("MDL").

### B.  NYCHA's Statutory and Common Law Obligations to Its Residents

41.    In addition to the promises made in the Lease Agreements, NYCHA also has an obligation to provide the Plaintiffs with habitable dwellings under New York statutory law (N.Y.

Real Prop. Law § 235-B) and common law precedent (*see, e.g.*, *Park W. Mgmt. Co.*, 47 N.Y.2d at 323-235).

## II.    For Years NYCHA Has Breached, and Continues to Breach, Its Obligation to Provide Decent, Safe, and Sanitary Housing to Its Residents.

42.    As noted above, NYCHA houses over 400,000 New Yorkers. Approximately 27 percent of Residents are children, nearly 20 percent are age 62 or older and more than 37,000 are both over 62 and live alone. Nonetheless, NYCHA has consistently failed in its obligations to provide adequate housing to its Residents, including the young and elderly. For example, New York State investigators sent to inspect a sample of 225 public housing apartments in March 2018 found that 212, more than 80 percent, had "at least one severe condition" that "could pose a health hazard" to those living there.[3] In October 2019, the Regional Planning Association—an independent non-profit group focused on improving living conditions in the New York metropolitan area—issued a report warning that NYCHA's "public housing has reached an unprecedented state of crisis" and was "nearly uninhabitable."[4]

43.    In 2018, HUD brought the action discussed above against NYCHA (the "DOJ Action"), asserting that "NYCHA[] violates basic health and safety regulations of [HUD]," which "require NYCHA to … provide residents decent, safe, and sanitary housing" and "repeatedly made false statements to HUD and the public regarding these issues and has deceived HUD inspectors."[5] At a news conference announcing the DOJ Action, United States Attorney Geoffrey Berman stated that NYCHA's "problems exist … because NYCHA was a

---

[3] Yoav Gonen, *Beleaguered NYCHA Chair Shola Olatoye is Resigning*, N.Y. POST (Apr. 9, 2018), https://nypost.com/2018/04/09/nycha-chief-shola-olatoye-is-resigning.

[4] Reg'l Plan Ass'n, NYCHA's Crisis: A Matter for All New Yorkers (Dec. 2018), available at http://library.rpa.org/pdf/RPA-NYCHAs_Crisis_2018_12_18_.pdf.

[5] Compl., *United States v. N.Y.C. Hous. Auth.*, No. 18-cv-05213-WHP (S.D.N.Y. June 11, 2018), ECF No. 1, ¶ 1.

dysfunctional operation and is fundamentally flawed and engaged in a culture of false statements and concealment."[6]

44.     On June 11, 2018, to resolve extensive and well-documented claims against it in the DOJ Action, NYCHA entered into a consent decree (the "Consent Decree"), Exhibit D, in which it admitted its responsibility for unsafe conditions in the NYCHA Developments and to making false statements about them to federal inspectors and the public. Among other things, NYCHA conceded:

- "At least once a year, beginning no later than 2010 and extending through 2016, NYCHA's certifications to HUD contained untrue representations that NYCHA 'will comply with' HUD's federal lead paint safety regulations."

- "At least once a year, beginning no later than 2010 and extending through 2016, NYCHA's certifications to HUD contained untrue representations that NYCHA was 'in compliance with all applicable Federal statutory and regulatory requirements.'"

- "Since at least 2010, NYCHA has not performed most of the biennial lead paint risk assessment reevaluations required by regulation for developments containing lead paint. In a 2011 email, a NYCHA director advised a NYCHA executive that NYCHA was not conducting required risk assessment reevaluations."

- "Between 2011 and present, NYCHA residents have made many thousands of complaints about mold growth every year."

- "In many cases, NYCHA staff verified that the mold growth covered 10 or more square feet. In nearly 300 cases between 2014 and 2016, the verified mold growth covered more than 100 square feet."

---

[6] Spectrum News NY1, *NYCHA Settlement Will Cost City $2B, Appoint a Federal Monitor*, NY1 NEWS (June 11, 2018), https://www.ny1.com/nyc/all-boroughs/news/2018/06/11/city- reaches-deal-on-nycha-settlement-terms.

- "Currently, after NYCHA has removed mold from apartments, the mold returns at least 30% of the time."

- "In 2016 alone, NYCHA experienced an average of more than 13 outages per elevator. The majority of NYCHA elevator buildings had at least one period with no functioning elevator service in 2016."

- "NYCHA's data reflects more than 260,000 work orders for cockroaches between 2013 and 2016. For the same period, there were more than 90,000 mouse work orders and nearly 36,000 rat work orders."

- "The number of work orders created for cockroaches nearly doubled between 2013 and 2016, and the number of apartments reporting mice and rat complaints has been increasing since 2013."

- "For a decade, NYCHA provided its staff with a list of 'Quick Fix Tips' to improve inspection scores. These Quick Fix Tips included replacing damaged ceiling tiles with 'painted cardboard,' covering broken fences with 2x4s painted black, and placing 'improperly stored flammables' 'out of sight' on the day of an inspection."

45.    Significantly, at a September 2018 hearing in the DOJ Action seeking approval for the Consent Decree, at which dozens of Residents testified about their NYCHA living conditions, Judge William H. Pauley agreed with the DOJ, describing NYCHA's failure to provide adequate housing as "absolutely stunning."[7] The DOJ Action ultimately led to the appointment of a Federal Monitor (the "Federal Monitor"), who similarly noted that "NYCHA routinely failed to comply with lead-based paint safety regulations and failed to provide decent, safe, and sanitary housing with respect to the provision of heat, hot water, and elevators, and the

---

7 Sarina Trangle, NYCHA Residents Detail Horrid Living Conditions *Before Federal Judge* (Sept. 26, 2018), AM N.Y. (Sept. 26, 2018), https://www.amny.com/news/nycha-court-hearing-1-21262062.

control and treatment of mold and pests." (Exhibit E).[8] The Federal Monitor further explained

that problems with "lead paint, mold, heat/hot water, elevators, pests, and waste management

share common causes that must be addressed for any individual solution to be effective.

NYCHA's housing stock is aging, and years of neglect have taken a toll."[9] In 2019, New York

Congresswoman Nydia Velazquez echoed these same sentiments, stating "there's been local

mismanagement of the agency throughout multiple mayoral administrations ... which saw a

mushrooming of unfulfilled repair orders and the decision to discontinue lead testing, from

which we're seeing the tragic results today."[10]

46.    None of NYCHA's numerous breaches of its obligations was a secret. As the

Federal Monitor noted, "New York City and national news media have made numerous reports

over many years about the plight NYCHA residents faced with these deficient conditions."[11] For

example, in July 2018, the *New York Times* reported that "[p]ublic housing in New York City has

become synonymous with the dilapidated living conditions many of its more than 400,000

residents have endured in recent years."[12] Similarly, in December 2019, the *New York Post*

reported that tenants in two cases filed against NYCHA in Brooklyn Housing Court claimed "the

New York City Housing Authority is miserably failing to provide legally required safe and

decent housing" and quoted one resident who stated, "We are living as if it's a third world

---

[8] Bart M. Schwartz, Monitor's First Quarterly Report 23 (July 22, 2019) ("Monitor's First Report"), *available at* https://nychamonitor.com/wp-content/uploads/2019/07/NYCHA-First-Report-7.22.19.pdf (attached as Exhibit E).

[9] *Id.* at 23-24.

[10] Greg B. Smith, *How NYCHA Lead and Repairs Scams Started Under Mike Bloomberg's Mayoral Watch*, THE CITY (Dec. 16, 2019), https://thecity.nyc/2019/12/how-nycha-lead-repair-scams-started-under-mike-bloombergs-watch.html.

[11] Monitor's First Report (Exhibit E) at 23.

[12] Luis Ferre Sandurni, *The Rise and Fall of New York Public Housing: An Oral History*, N.Y. TIMES (July 8, 2019), https://www.nytimes.com/interactive/2018/06/25/nyregion/new-york-city- public-housing-history.html.

country."[13] That same month, New York City Public Advocate Jumaane Williams named NYCHA as the City's worst landlord for the second year in a row. He explained that NYCHA Developments have "bad [housing code] violations. They're things that you can't live there and be a human being."[14]

47.    While the Federal Monitor is charged with remedying the deplorable conditions in NYCHA Developments, the Director of Columbia Law School's Health Justice Advocacy Clinic has described the appointment of that Monitor as "the equivalent of nailing a 2-by-4 to a collapsing building." She further explained that "[t]he conditions of public housing in New York City are deplorable," and NYCHA is "[b]eset by lead-paint hazards, mold, heating failures, and chronic mismanagement" that pose "a danger to [NYCHA's] 400,000 residents."[15]

48.    Although in the Consent Decree NYCHA promised to remedy its breaches, NYCHA has not done that. Harmful conditions continue to plague the NYCHA Developments, including Harlem River Houses. Recurring mold growth (which was supposed to be addressed in a separate Consent Decree in *Baez v. NYC Housing Authority*, 13 Civ. 8916 (WHP)) continues to infect thousands of apartments because of leaks and poor ventilation, a particular health risk for Residents with asthma. Pest infestations, including rats, inside and on surrounding grounds, remain common, fostered by NYCHA's failure to fix leaks and provide basic sanitation. Elevators frequently fail to work, stranding elderly and disabled tenants. Incredibly, lead paint safety rules are still violated in the majority of NYCHA Developments. Water and sewage leaks

---

[13] Jacob Henry & Rich Calder, *Tenants at Two Dilapidated NYCHA Complexes Sue Over Living Conditions*, N.Y. POST (Dec. 13, 2019), https://nypost.com/2019/12/13/tenants-at-two-dilapidated-nycha-complexes-sue-over-living-conditions.

[14] *Public Advocate Releases List of New York City's Worst Landlords*, NY1 NEWS (Dec. 16, 2019), https://www.ny1.com/nyc/all-boroughs/news/2019/12/16/public-advocate-releases-list-of-new-york-city-s-worst-landlords.

[15] Emily A. Benfer, *New York's Public Housing System is the Size of a City. It's Failing Children.*, WASH. POST (Feb. 11, 2019), https://www.washingtonpost.com/opinions/new-yorks- public-housing-system-is-the-size-of-a-city-its-failing-children/2019/02/11/458f63c2-2bb7-11e9- 984d-9b8fba003e81_story.html.

are common and peeling paint frequently goes unaddressed. NYCHA's own maintenance procedures often are not followed. Many categories of repairs that should be quickly addressed instead take weeks or, more often, months. Garbage compactors and boilers which should have been retired 10-20 years ago frequently break down, and take months to repair, depriving residents of heat, hot water, and garbage disposal. In recent years, the New York City Department of Investigation ("DOI") has also found that NYCHA fails to properly conduct key safety checks of items like smoke and carbon monoxide detectors in its apartments, and the New York City Comptroller has found that the majority of NYCHA's playgrounds have "substandard and visibly hazardous conditions."

49.    NYCHA's breaches of its obligations have led Residents to resort to unsafe self-help by, among other things, scraping large mold patches from their bathroom ceilings and using potentially dangerous pesticides. They also are forced to utilize dirty, unlit, hazardous stairwells when the elevators do not work.

50.    NYCHA's failures have been documented by the Monitor appointed pursuant to the *U.S. v. NYCHA* Consent Decree, in each of his eight reports since July 22, 2019. His most recent reports, demonstrating ongoing mold problems, lead paint violations, falling ceilings, unattended trash, and a lack of heat, are annexed as Exhibits S, T and U.

51.    Specific failures by NYCHA to provide its Residents with decent, safe, and sanitary housing are described below.

A.    <u>NYCHA Has Failed to Repair and Maintain Plumbing Systems and to Adequately Remediate Mold and Mildew.</u>

52.    Under the Lease Agreements and State and Federal Law, NYCHA is required to maintain plumbing and drainage systems that are in good and safe working order and are functionally adequate. (*See, e.g.*, Lease Agmt. § 12(e).) The Lease Agreements also require

21

NYCHA to comply with the MDL, which provides that NYCHA, as the owner of the NYCHA Developments, must "keep clean at all times, and in good repair, the entire plumbing and drainage system including every water-closet, toilet and sink and every other plumbing fixture therein" of each NYCHA Development. MDL § 77(4).

53.     NYCHA continually fails to comply with these obligations, rendering NYCHA dwellings unsafe and uninhabitable. The water pipes in the NYCHA Developments are almost universally old and insufficient to handle the amount of water needed to properly service the Plaintiffs' normal and daily needs. As a result, the water pipes frequently become clogged.

54.     In addition to becoming clogged, pipes also frequently leak. A March 2018 investigation of 255 NYCHA Developments by the New York State Department of Health (the "2018 DOH Investigation") found that 21% of the NYCHA Development units inspected had a "high severity water intrusion," defined as an active leak, a leak that has caused structural damage or a sewage leak. The investigators further found potential structural issues that appeared to have been caused by previous leaks that had never been properly addressed by NYCHA maintenance staff.[16]

55.     Further, although Residents regularly report leaks to NYCHA and request repairs, NYCHA does not respond to the requests in a timely manner, when it responds at all. The Federal Monitor's First Report, dated July 22, 2019 (the "Monitor's First Report"), Exhibit E, noted that residents of the NYCHA Developments made "numerous complaints" about

---

[16] N.Y. State Dep't of Health, Assessment of New York City Housing Authority (NYCHA) Properties 9 (Mar. 2018) ("2018 DOH Investigation"), *available at* https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/FINAL_Assessment_ of_NYCHA_Report.pdf.

emergency requests for repairs, including "serious water leak[s]," that were "unaddressed for weeks or, in some cases, not at all."[17]

56.    Inevitably, the unaddressed leaks and resulting moisture cause mold. A survey conducted by the Red Hook Initiative in 2016 found that 94 percent of nearly 300 Residents surveyed currently had or previously had leaks and/or mold in their apartments. Nearly 40 percent of Residents who reported mold to NYCHA did not receive any response, and less than 16 percent of Residents who did receive a response described the outcome of that response as positive.[18] In 2014, in the context of a class action lawsuit (*Baez*) brought to address these problems, NYCHA entered into a Court approved, and therefore enforceable Consent Agreement on behalf of all NYCHA tenants, to address the mold problem. Seven years later little or no action has been taken.

57.    The Monitor's First Report—as well as the Federal Monitor's Second Report dated, November 1, 2019 (attached as Exhibit G)—verifies that these leak and mold problems continued through 2019. For the period from November 2018 through January 2019, 3,293 "7-day" mold work orders (reflecting major mold occurrences) were created and only 1,805 were closed. Of those closed, nearly one-third (31%) were not closed within seven days. During the same period, 3,960 "15-day" mold work orders (reflecting more minor mold occurrences) were created and only 1,006 were closed. Of those closed, one-third (33%) were not closed within 15 days.[19]

58.    The Monitor's Second Report (Ex. F) also found that from May 1 to July 31, 2019, 10 percent of "7-day" mold work orders were not completed within seven days, and 43

---

[17] Monitor's First Report (Exhibit E) at 78.

[18] Red Hook Initiative, The Impact of Mold on Red Hook NYCHA Tenants 13, 17 (2016), *available at* http://rhicenter.org/wp-content/uploads/2016/10/ImpactofMold_RHI_- FINALREPORT_10.27.16.pdf.

[19] Monitor's First Report (Ex. E) at 44.

percent of "15-day" mold work orders were not completed within 15 days.[20] The Monitor's Second Report also states that "[t]hough leadership at NYCHA has, for years, known of the scope of the mold problem, … [t]housands of NYCHA residents have long suffered and continue to suffer from the effects of mold and the lack of urgent, rigorous action by NYCHA," and concludes that "NYCHA is currently not using its best efforts and technically is in violation of the Revised Consent Decree in *Baez* [*v. N.Y.C. Hous. Auth.*, an action filed in 2013] and thus the HUD Agreement as it pertains to mold."[21]

59.    The Federal Monitor's third report, dated February 4, 2020 (the "Monitor's Third Report") (Ex. G), found that "NYCHA has a long way to go to effectively remediate mold in apartments and common areas" and that "the fundamental question of how NYCHA will apply adequate resources and methods to comply with the [HUD Settlement] Agreement and the *Baez* Consent Decree remains unanswered."[22]

60.    The Federal Monitor's fourth report, dated May 18, 2020 (the "Monitor's Fourth Report") (Ex. H), similarly found that "NYCHA continues to have serious problems with mold" and that that "for the quarter ending January 31, 2020, only 34% of '15-day' mold work orders were completed within 15 days." The Federal Monitor also warned that NYCHA's "battle against mold" would likely "become[] complicated by the impact of the COVID crisis."[23]

---

[20] Bart M. Schwartz, Monitor's Second Quarterly Report 33-34 (November 1, 2019) ("Monitor's Second Report"), *available at* https://nychamonitor.com/wp-content/uploads/2019/11/NYCHA-  Monitor-Second-Quarterly-Report-11.1.19-FINAL.pdf. (Exhibit F)

[21] *Id.* at 34, 36.

[22] Bart M. Schwartz, Monitor's Third Quarterly Report 5, 39 (Feb. 4, 2020)(Ex. G) ("Monitor's Third Report"), *also available at* https://nychamonitor.com/wp-content/uploads/2020/02/NYCHA-Monitor-Third-Quarterly-Report-2.4.20.pdf.

[23] Bart M. Schwartz, Monitor's Fourth Quarterly Report 36, 38 (May 18, 2020)(Ex. H) ("Monitor's Fourth Report"), *also available at* https://nychamonitor.com/wp-content/uploads/2020/05/NYCHA-Monitor-Fourth-Quarterly-Report-5.18.20.pdf.

61.     In his letter submitted in lieu of a Fifth Quarterly Report (the "Monitor's Fifth Report Letter") (Ex. I), the Federal Monitor confirmed that the NYCHA's problems with mold worsened during the COVID-19 pandemic. During the period from March 23 through June, nearly half (45.5%) of "7-day" mold work orders were not completed within 7 days, and more than eight in ten (81.8%) "15-day" mold work orders were not completed within 15 days.[24]

62.     The presence of mold in the NYCHA Developments is also in violation of the HUD Housing Standards, which provide that "dwelling units and common areas must have proper ventilation and be free of mold." 24 C.F.R. § 5.703(f). The NYC Housing Code similarly provides that NYCHA, as the owner of the NYCHA Developments, "shall take reasonable measures to keep the premises free from … indoor allergen hazards and from any condition conducive to indoor allergen hazards, and shall take reasonable measures to prevent the reasonably foreseeable occurrence of such conditions and shall take reasonable measures to expeditiously remediate such conditions and any underlying defect[.]" N.Y.C. Admin. Code § 27-2017.1.

63.     If and when NYCHA finally does attempt to repair leaks and remediate mold in the NYCHA Developments, the efforts are often inadequate. The Monitor's First Report (Exhibit E) found that from November 2018 through January 2019, mold reoccurred in nearly half (47%) of reported cases for which mold work orders had been closed.[25]

64.     The recurrences of leaks and mold are due, in large part, to the fact that NYCHA's repairs do not address the underlying problems, such as poorly maintained and inadequate water pipes. As the Monitor's First Report explains, cutting and replacing sections of

---

[24] Letter from Bart M. Schwartz 5 (Aug. 13, 2020) ("Monitor's Fifth Report Letter")(Ex. I), *also available at* https://nychamonitor.com/wp-content/uploads/2020/08/8.13.20-Fifth-Quarterly-Report-Letter- Final.pdf.

[25] Monitor's First Report (Ex. E) at 44.

piping often simply moves the points at which water pressure builds and causes a leak farther down the pipe.[26] Problems with leaks and mold are also caused by the poor condition of roofs in the NYCHA Developments, including those in the Red Hook Developments in Brooklyn, which were severely damaged by Hurricane Sandy in 2012.[27] In 2017, NYCHA began the first phase of a post-Sandy reconstruction project planned to involve the installation of new roofs on all 28 buildings in the Red Hook Developments. However, many of the roofs have not been replaced, and the projected completion date for the first phase of the project has already been pushed back from 2021 to 2022.[28] In a July 2019 inspection of 35 roofs repaired by NYCHA, the New York City Comptroller found that more than half (54%) of the repairs had moderate or significant deficiencies that left the roofs "susceptible to water penetration and an accumulation of moisture under the roof line—an ideal condition for mold to grow."[29]

65.    The leaks, mold and other problems caused by the inadequate plumbing systems in the NYCHA Developments pose a significant risk to the Plaintiffs, and Plaintiffs' class's health and safety. When mold grows in a home, it can release toxins and allergens linked to significant respiratory problems, including asthma attacks. Asthma is also a significant public health problem for adults in the NYCHA Developments. According to data from the New York City Department of Health ("NYC DOH"), between 2012 and 2014 the rate of asthma hospitalizations for NYCHA tenants aged 20 and above was four times higher than for the rest of New York City. Further,

---

[26] *Id.* at 45.

[27] *See* Sophie Kasakove & Tracie Williams, *Is New York City's Public Housing Ready for the Next Storm?*, THE NATION (Jan. 29, 2019), https://www.thenation.com/article/new-york-climate-change-public-housing ("Next Storm Article").

[28] *Id.*

[29] Marjorie Landa, City of N.Y. Office of the Comptroller, Audit Report on the New York City Housing Authority's Preventative Maintenance and Repairs on Roofs Under Warranty (July 29, 2019), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/SE18-059A.pdf.

crumbling walls, caved-in ceilings and flooded floors from persistent leaks are certainly not within anyone's definition of "decent" housing as NYCHA is obligated to provide.

66.     Leaks and mold problems continue to pose health and safety risks on a similar level as when the Consent Decree was entered into. For example, in the Eighth Quarterly Report, Exhibit S, the Monitor reported: "The investigation revealed that superficial mold repairs had been made in some units throughout 2020 as the property was being prepared for the conversion, and in many cases, mold was literally being covered up with drywall. In one egregious case, visible signs of mold were evident on recently-installed sheetrock on a bathroom ceiling. Upon removing the sheetrock, it was revealed that the ceiling rafters were contaminated with severe mold growth, indicating that the mold problem had existed for some time and clearly had not been addressed before the new sheetrock was installed." We recently examined a work order for a development in the South Bronx that listed the root cause for the mold as "resident cause," without the required further explanation for the basis for this assessment. A review of relevant photos of the ceiling, however, shows that the leak clearly comes from above. Additionally, there is a hole in the wall behind the toilet. Three child work orders were created for painting and mold cleaning, yet no work orders were opened to investigate the leak of the hole in the wall. In the Ninth Monitor's Report (Exhibit T), he stated: "In another recent example, the Monitor team found that a superintendent in a Manhattan development appeared to be entering false moisture readings into the mold inspection work order. The matter was referred to NYCHA's Compliance Department. When Compliance interviewed the superintendent, he admitted that they were intentionally not taking proper moisture readings so they could reduce the number of positive findings to lessen their work loads."

**B.**     **NYCHA Has Failed to Inspect for and Remediate Lead-Based Paint.**

67.     Under the HUD Housing Standards, which are expressly incorporated into the Lease Agreements, "housing must comply with all requirements related to the evaluation and reduction of lead-based paint hazards and have available proper certifications of such." 24 C.F.R. § 5.703(f). Further, HUD regulations regarding lead-based paint require that a lessor of residential property must, among other things, "disclose to the … lessee the presence of any known lead-based paint." 24 C.F.R. § 35.88(a)(2). HUD regulations also require public housing agencies to conduct lead-based paint inspections, *see id.* § 35.1115, and to abate all lead-based paint hazards identified in such an inspection. *See id.* § 35.1120.

68.     In addition, a provision of the NYC Housing Code known as N.Y.C. Local Law 1 of 2004 ("LL1") requires NYCHA, as the owner of the NYCHA Developments, to conduct an investigation of all units in which a child under age six resides if NYCHA "has actual knowledge of the presence of lead-based paint and in common areas" at least "once a year and more often if necessary," such as when "an occupant makes a complaint concerning a condition that is likely to cause a lead-based paint hazard or requests an inspection." N.Y.C. Admin. Code § 27-2056.4(a). The NYC Housing Code further requires that NYCHA "take action to prevent the reasonably foreseeable occurrence of … and shall expeditiously remediate" any lead-based paint hazard, *id.* § 27-2056.3, and to comply with specified work practices when performing such remediation or performing other work that will "disturb more than one hundred square feet of lead-based paint or paint of unknown lead content" or "involve the removal of two or more windows with lead-based paint or paint of unknown lead content." *Id.* § 27-2056.11.

69.     Lead-based paint has long been a significant hazard for Residents in many NYCHA Developments, and yet in 2012, NYCHA breached its significant obligations regarding

lead paint by *halting its annual inspections for lead.*[30] A September 2019 report of an investigation conducted by the New York City Comptroller states that between January 1, 2013 and October 10, 2018, 572 NYCHA buildings were not inspected by NYCHA.[31] Those inspections continue to be sporadic.

70.    Further, for years, NYCHA not only failed to complete the required lead inspections in the NYCHA Developments, but also knowingly and falsely certified to HUD and the public that it was compliant with federal, state, and local laws and performing lead paint inspections on NYCHA residences on an annual basis. On December 5, 2017, then Chair of NYCHA Shola Olatoye ("Olatoye") made serious misrepresentations to the New York City Council about lead issues, and both Olatoye and the General Manager of NYCHA resigned from their positions in the wake of the public reckoning. Specifically, Olatoye testified to the City Council that all NYCHA lead inspectors conducting inspections of the 4,200 units with children under the age of six years were properly certified by HUD, and yet the DOI "discovered that none of the (lead paint) inspections were conducted by employees who NYCHA reported as having the HUD certification."

71.    NYCHA not only stopped conducting many required inspections, it also made misrepresentations about the inspections it actually did conduct when those inspections revealed significant lead exposure. NYCHA's own inspection data reveals that, of the 3,096 apartments inspected in the 2012 through early 2015 timeframe, 1,604 (52%) tested positive for lead and required abatement. At NYCHA's Red Hook Developments, NYCHA found lead paint in 105 out

---

[30] Mark G. Peters, Comm'r of N.Y.C. Dep't of Investigation, Investigation into False Certification of NYCHA Lead Paint Inspections 3 (Nov. 2017) ("DOI Lead Paint Report"), *available at* https://www1.nyc.gov/assets/doi/press-releases/2017/nov/27NYCHALeadPaint11-14-2017_UL.pdf.

[31] N.Y.C. Comptroller, N.Y.C. Comptroller Scott Stringer's Investigation into Child Lead Exposure 24 (Sept. 2019), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/Lead-Investigation.pdf ("Comptroller's Lead Report").

of 113 apartments—an astonishing 93 percent of all apartments tested. In 2016, NYCHA estimated that 55,000 of its apartments contained lead paint, including at least 10,000 housing children 6 years old or under.[32] In June of 2018, New York City Mayor Bill De Blasio ("De Blasio") revealed that the number could be nearly three times higher: up to 130,000 apartments, or 75 percent. This was in direct contradiction to De Blasio's 2017 statement to reporters: "I want to emphasize again, the universe [of dwellings containing lead paint] is not 175,000 apartments. It's 50,000 … that even have the possibility of having lead in them … that's fixed."[33]

72.    Eight hundred and twenty children living in NYCHA Developments over the period from 2012-2016 were tested and found to have dangerous levels of lead exposure,[34] and those were only the children tested. Given the pervasiveness of the toxic paint indicated by NYCHA's own inspection, the actual number of children who have been exposed is certainly much higher.

73.    Ultimately, the DOI conducted an in-depth investigation of NYCHA's practices related to lead paint exposure. On November 14, 2017, it published the resulting report, which made NYCHA's failure to keep its residents safe from lead poisoning public knowledge.[35] As noted above, in the June 2018 Consent Decree (Ex. D), NYCHA admitted that "[s]ince at least

---

[32] Press Release, N.Y.C. Hous. Auth., Lead-Based Paint and New York City Housing Authority (NYCHA) Facts (June 12, 2016), *available at* https://www1.nyc.gov/assets/nycha/downloads/pdf/lead-based-paint-dohmh-nycha-20160612.pdf.

[33] *See* Rich Calder, *De Blasio Admits There Could Be Up to 130K Lead-Tainted NYCHA Apartments*, NEW YORK POST (July 9, 2018), https://nypost.com/2018/07/09/de-blasio-admits- there-could-be-up-to-130k-lead-tainted-nycha-apartments.

[34] Nolan Hicks, *Officials Found Elevated Lead Levels in Up To 820 Children—But Didn't Follow Up*, N.Y. DAILY NEWS (July 1, 2018), https://nypost.com/2018/07/01/officials-found- elevated-lead-levels-in-hundreds-of-children-but-didnt-follow-up.

[35] N.Y.C. Dep't of Investigation, DOI Investigation Reveals NYCHA Failed to Conduct Mandatory Lead Paint Safety Inspections for Four Years (Nov. 14, 2017), *available at* https://www1.nyc.gov/assets/doi/press-releases/2017/nov/27NYCHALeadPaint11-14- 2017_UL.pdf.

2010, NYCHA has not performed most of the biennial lead paint risk assessment reevaluations required by regulation for developments containing lead paint."

74.    While NYCHA is hiding and dissembling, Residents exposed to lead, including Plaintiffs and the Class they represent, due to NYCHA's malfeasance, are risking devastating damage to their brains and vital organs. For example, NYCHA allowed a family with an infant daughter to move into a unit it knew, but did not reveal, contained dangerous levels of lead paint, and by the time the child was 2 years old, a blood test revealed she had 5.6 micrograms of lead per deciliter—no amount is safe, and 5 micrograms is toxic.[36] As another example, a young girl who lives in a NYCHA Development was recently awarded $57 million because exposure to lead caused her blood-lead levels to reach 9 times the acceptable amount, resulting in serious developmental delays.[37]

75.    The Comptroller's report explains that New York City's Department of Housing, Preservation and Development ("HPD") does not receive or respond to complaints made by Residents through the public service number 311. Instead, 311 operators routinely route such complaints to NYCHA. Except in rare cases when HPD is directed by a NYC Housing Court order to respond to lead paint complaints, the responsibility for responding to those complaints is left to NYCHA. Thus, the report concludes, "NYCHA was allowed to police its own compliance with LL1."[38]

---

[36] *See* Molly Crane-Newman & Greg B. Smith, *NYCHA Let Children Live in Homes They Knew Were Toxic From Lead Paint as Young Residents Are Beset by Disabilities*, N.Y. DAILY NEWS (Dec. 26, 2017), http://www.nydailynews.com/new-york/nycha-children-live-homes-knew-toxic- article-1.3722174.

[37] *Family Awarded $57M After Jury Finds NYCHA Responsible for High Lead Levels in Girl's Bloodstream*, NY1 NEWS, https://www.ny1.com/nyc/all-boroughs/news/2018/01/29/family-   awarded--57m-after-jury-finds-nycha-responsible-for-high-lead-levels-in-girl-s-bloodstream.

[38] Comptroller's Lead Report at 24-25.

76.     Although NYCHA claims that it is now testing for lead, it is clear that additional testing and abatement is needed. As of July 29, 2019, NYCHA had identified 46,372 units in the NYCHA Developments built before 1978 in which a child under six was known to reside and conducted visual assessments of 44,387 units. The assessments found that 39,596—nearly 90 percent—of the units had "Identified Deficiencies," which required NYCHA to perform interim control work to reduce the Residents' risk of exposure to lead-based paint. NYCHA has not performed any interim control work in more than two-thirds (68%) of the units it identified.[39] Further, as of October 31, 2019, NYCHA had conducted X-ray Fluorescence ("XRF") testing in less than 15 percent of the total 134,084 units in the NYCHA Developments built before 1978. NYCHA has not released the test results for nearly half (46%) of the units that have been tested, and yet nearly three in five (58%) of the units for which NYCHA has released results tested positive for lead.[40]

77.     The Monitor's Second Report (Ex. F) notes that XRF testing is "significantly behind NYCHA's publicized schedule for completion (by the end of 2020)" and that the Federal Monitor "continue[s] to believe that inadequate resources are being applied to XRF testing and that NYCHA must use better methods to identify locations where children under six reside or regularly visit."[41]

78.     It is clear that such identification and testing is necessary, because in the period from August through October 2019 alone, NYCHA notified HUD of 28 children who live in NYCHA Developments with elevated blood lead levels.[42] In addition to requiring public housing

---

[39] Monitor's Second Report, App'x 4 at 12-13.

[40] Lead-Based Paint Report: XRF Testing Initiative, N.Y.C. HOUS. AUTH., *available at* https://my.nycha.info/PublicSite/Transparency/XrfReport (last visited Nov. 6, 2019).

[41] Monitor's Second Report (Ex. F) at 24, 25 n.3.

[42] *Id.* at 31.

agencies to test for lead, federal regulations also require housing agencies to follow work practices set forth in the Renovation, Repair, and Painting Rule ("RRP Rule") to reduce the risk of lead exposure during renovation work. *See* 40 C.F.R. § 745.85. And yet, the Monitor's First Report (Ex. E) found that "adherence to the [RRP] [R]ule has not been uniform, nor has it been strictly enforced or supervised by NYCHA," that "the norm was that some violation of the [RRP] Rule would occur in all jobs," and that "NYCHA lacks a comprehensive policy to address the many issues surrounding lead-based paint."[43]

79.     Further, the Monitor's Second Report (Ex. F) found that NYCHA was still "not in compliance with lead-based paint regulations and many required lead safe work practices," and that "broad IT improvements must be made by NYCHA to bolster necessary record keeping for work that must comply with lead-based paint regulations."[44] Among other things, the Federal Monitor noted that the "current method of 'signing in' contractors and their teams via day books (with little to no information about the actual composition and credentials of their teams recorded at many [NYCHA D]evelopments) is clearly insufficient to meet NYCHA's critical need for reliable and efficient record keeping."[45]

80.     In a July 31, 2019 report to the Federal Monitor submitted in connection with its certification to HUD, **NYCHA acknowledged that its practices have "not resulted in timely clearance examinations**," and that "many sites have not received any clearance examination as required." NYCHA further stated that "[t]he number of units with no clearance examinations since the Summer of 2018 following either RRP or Interim Control work is 12,046."[46] In

---

[43] Monitor's First Report (Ex. E) at 33.

[44] *Id.*; Monitor's Second Report (Ex. F) at 4.

[45] Monitor's Second Report (Ex F) at 29.

[46] *Id.* at 27 n.5 & App'x 4 at 25.

September 2019, NYCHA was only able to document timely collection of dust wipe samples approximately 71% of the time.[47]

81.    In the Monitor's Third Report (Ex. G), the Federal Monitor noted that only about 20% of apartments that NYCHA identified that needed to be tested for lead-based paint had been tested, and 55% of the apartments tested were positive. The Federal Monitor also found that, as of February 20, 2020, NYCHA was "unable to ensure that next-day clearance is obtained (or even that wipes are taken within 48 hours), and no protection or temporary housing is given to residents before clearance is obtained."[48]

82.    The Monitor's Fifth Report Letter (Ex. I) found that NYCHA has "accrued a significant backlog of lead paint corrective work in apartments which must be addressed" and "NYCHA continues to face a great challenge in the timely and successful performance of dust wipes necessary to clear apartments for safe occupancy after lead paint work is completed."[49]

83.    The Federal Monitor also noted that "[a]lthough no key HUD Agreement deadlines relating to lead came due in the past quarter, future deadlines are at great risk of noncompliance."[50]

84.    On October 22, 2020, the Federal Monitor released a statement revealing that there was a "significantly larger number of apartments where children under six reside who might be exposed to lead risks" than previously believed. The Federal Monitor explained that "as a result of its dialogue with residents during in-apartment XRF testing visits, and NYCHA's 'door knocking' campaign, through which NYCHA directly engages residents," NYCHA

---

[47] *Id.* at 2.

[48] Monitor's Third Report (ex. G) at 29-30.

[49] Monitor's Fifth Report Letter (Ex. I) at 5.

[50] *Id.*

"identified a significantly larger number of apartments where children under six reside who might be exposed to lead risks. Approximately 6,000 apartments have been added to the count available two years ago, which was around 3,000 based on an annual certification process."[51]

85.    NYCHA's failure to comply with state and federal regulations regarding lead-based paint continues to pose a significant risk to the Plaintiffs and Plaintiff's class's health and safety. *See* Monitor's Ninth Report, Exhibit T: "NYCHA has identified 4,523 apartments with positive components in buildings with local and/or federal exemptions from lead-based paint requirements. This finding has required modifications to the Maximo work order system, as well as adding these apartments to the lead compliance program. Second, Compliance has identified that, for over 94% of work orders potentially subject to RRP requirements, NYCHA renovators are indicating on the work order that they are not performing work that requires RRP protocols."

### C.    NYCHA Has Failed to Repair and Maintain Working Drainage and Sewage Systems.

86.    The drainage systems in the NYCHA Developments suffer from problems similar to those that plague the plumbing systems. The drainage systems are old and inadequate to meet the Plaintiffs' needs, and in failing to repair and maintain the drainage and sewage systems, NYCHA is in violation of Section 12(e) of the Lease Agreements and Section 77(4) of the MDL.

87.    The Monitor's First Report (Ex. E) noted that in the Polo Grounds Towers Development in Manhattan, just north of Harlem River Houses, a large pipe was "cascading putrid liquid." Several work orders were entered into NYCHA's database reporting the problem, but at least one of the work orders was closed without explanation, and a worker mopping up the liquid told the Federal Monitor that the problem had not been repaired for more than two months.

---

[51] Press Release, NYCHA's Efforts to Locate Child Under Six in Apartments That May Contain Lead Paint (Oct. 22, 2020), *available at* https://nychamonitor.com/nychas-efforts-to-locate- children-under-six-in-apartments-that-may-contain-lead-paint.

When the Federal Monitor's investigative team alerted NYCHA's senior management, the problem was repaired within three hours.[52]

88.     Residents at the Baruch Development in Manhattan regularly have problems with sewage flooding into their bathrooms. Although NYCHA has responded to some of their requests for repairs, those repairs have not been effective in remedying the problem.[53]

89.     When NYCHA does make repairs to the drainage systems, the repairs are inadequate, because they do not address the underlying problem—the fact that the drainage system cannot meet the needs of all NYCHA Development units. As with the water pipes, repairing one section of a damaged sewer pipe often simply causes the pressure to build up at another point further down the pipe.

90.     The unsanitary conditions caused by the sewage systems in the NYCHA Developments continue to pose a significant risk to the Plaintiffs and Plaintiffs' class's health and safety.

### D.     NYCHA Has Failed to Repair and Maintain Electrical Systems.

91.     Pursuant to the Lease Agreements, and Federal, State and NYC Law, NYCHA must "maintain in good and safe working order and condition electric … facilities and appliances … supplied by [NYCHA]." (Lease Agmt. § 12(e)). The Lease Agreements also require NYCHA to comply with the Housing Standards, which provide that "[e]ach building's … electrical system … must be free of health and safety hazards, functionally adequate, operable, and in good repair," 24 C.F.R. § 5.703(d)(1), as well as the NYC Housing Code, which requires NYCHA to "equip every dwelling for lighting by electricity" and to provide lighting in "public hallways,

---

[52] Monitor's First Report (Ex. E) at 7.

[53] *Sewage Backs Up into Apartment at NYCHA Complex*, FOX 5 NEW YORK NEWS (June 25, 2019), https://www.fox5ny.com/news/sewage-backs-up-into-apartment-at-nycha-complex.

stairs, fire stairs, and fire towers" and "common laundry rooms" as well as "near the outside of the front entrance way of the building" and in "every yard and court." N.Y.C. Admin. Code §§ 27-2037, 27-2038(a), 27-2040. Finally, the Lease Agreements also require NYCHA to comply with the MDL, which requires NYCHA to "install and maintain a light or lights outside of the front entrance way of the building[s]" providing specified amounts of illumination, and to provide a light or lights of specified illumination in "every vestibule and entrance hall in every public hall, stair, fire-stair and fire-tower on every floor" and, if necessary, to provide lighting "sufficient to permit a person to read the names on a mail box or other receptacle for mail." MDL §§ 35, 37.

92.    However, the electrical systems in the NYCHA Developments are not in good and safe working order or repair, and electrical outages are common. For example, in April 2018, the transformer burned out in the Andrew Jackson Houses Development in the Bronx. In November 2018, residents were still relying on backup generators, which failed on a near-daily basis. On at least one occasion, there were four power outages in a single day.[54]

93.    In July 2019, another transformer fire in the Andrew Jackson Houses Development caused two electrical outages within two days. The outages left at least 125 units without air conditioning or water in the middle of summer.[55] A month later, the Andrew Jackson Houses Development was still using backup generators."[56]

---

[54] *See* Gaspard Le Dem, *Power Outages Plague Exasperated NYCHA Residents*, CITY LIMITS BLOG (Nov. 9, 2018), https://citylimits.org/2018/11/09/power-outages-plague-exasperated- nycha-residents.

[55] Mark Sundstrom & Katie Corrado, *Power Restored After Second Outage at Bronx NYCHA Building Left Dozens in the Dark*, PIX 11 NEWS, https://pix11.com/2019/07/12/power-restored- after-second-outage-at-bronx-nycha-building-left-dozens-in-the-dark.

[56] Nolan Hicks & Elizabeth Rosner, *Bronx NYCHA Complex Has Been Depending on Generators for a Month*, N.Y. POST (Aug. 14, 2019), https://nypost.com/2019/08/14/bronx- nycha-complex-has-been-depending-on-generators-for-a-month.

94.     Residents often experience electrical problems in their individual apartments. The 2018 DOH Investigation found that over 17 percent of the inspected units had electrical problems and noted that tenants commonly reported electrical outlets in their units were inoperable. *Id.* at 8.

95.     When NYCHA does make electrical repairs, it does not do so in a timely manner, if it responds at all. Moreover, the repairs NYCHA makes are temporary and do not fix the underlying problem, which is that the electrical systems in the NYCHA Developments are old and should be replaced.[57] Electrical outages that leave the NYCHA Developments without air conditioning and water pose a significant risk to the Plaintiffs' health and safety, especially during the hot summer months.

96.     Faulty electrical systems, faulty outlets, fuse boxes and circuit breakers continue to pose health and safety risks to the Plaintiffs and prospective Class Members, including the fact that such issues are serious fire hazards.

**E.      NYCHA Has Failed to Repair and Maintain Operative, Safe and Clean Elevator Systems.**

97.     Under the Lease Agreements, Federal and NYC law, NYCHA must "maintain in good and safe working order and condition … elevators, supplied by [NYCHA]." (Lease Agmt. § 12(e)). Additionally, the Lease Agreements require NYCHA to comply with the Housing Standards, which provide that "[e]ach building's … elevators … must be free of health and safety hazards, functionally adequate, operable, and in good repair." 24 C.F.R. § 5.703(d)(1). Finally, pursuant to the Lease Agreements, NYCHA is required to comply with the MDL, which provides that dwellings that exceed six stories or sixty feet in height "shall be equipped with one

---

[57] *See, e.g.*, Kelly Mena, *Tenants of NYCHA's Red Hook Houses Get Federal Attention*, BROOKLYN DAILY EAGLE (Aug. 27, 2019), https://brooklyneagle.com/articles/2019/08/27/nycha- red-hook-houses-hud-visit.

or more passenger elevators, *operative at all times*, at least one of which shall be accessible to every apartment above the entrance story." MDL § 51(6) (emphasis added). NYCHA repeatedly fails to abide by these obligations.

98.    For example, in 2016, an 84-year-old man died from injuries suffered while attempting to use an elevator in the Pelham Parkway Development. A subsequent investigation by the DOI found that a "brake monitor" safety device on the elevator was broken and may have prevented the accident if it had been functioning properly. The investigation found that more than 7 percent of all brake monitors installed in all NYCHA Developments were not functioning properly.[58]

99.    As a result of its investigation, the DOI made 14 specific recommendations to NYCHA to enhance its elevator maintenance protocols, improve its response to complaints about malfunctioning elevators and enhance safety.[59] However, problems with elevators have continued.

100.    In July 2019, an elevator outage at 154 West 84th Street in Manhattan lasted for nearly two weeks, trapping several residents who use wheelchairs in their apartments.[60] Further, a September 2019 investigation by local news agency NY1 found that between 2012 and 2018, the number of elevator outages in the NYCHA Developments increased by more than 16 percent. Across all of the NYCHA Developments, the outages lasted an average of 12 hours. In the

---

[58] Mark G. Peters, Comm'r of N.Y.C. Dep't of Investigation, Elevator-Related Accidents and Fatality at NYCHA Public Housing 1, 3, 5 (Mar. 2016), *available at* https://www1.nyc.gov/assets/doi/reports/pdf/2016/2016-03-29-Pr08nychaelevator.pdf.

[59] *Id.* at 11-14.

[60] Nolan Hicks & Olivia Bensimon, *Elderly NYCHA Tenants Trapped in their Homes for 13 Days Because of Elevator*, N.Y. POST (July 19, 2019), https://nypost.com/2019/07/19/elderly- nycha-tenants-trapped-in-their-homes-for-13-days-because-of-elevator.

Mitchel Development in the Bronx, which had the greatest number of outages, the outages lasted an average of 22 hours.[61]

101.    At a September 4, 2019 New York City Council Hearing (the "September 2019 Hearing"), NYCHA's Senior Vice President for Operations Support Services, Joey Koch ("Koch"), testified that from January through August 2019, there were 28,400 elevator outages across all of the NYCHA Developments. Koch further testified that NYCHA has received at least 11,000 notices of elevator violations from the New York Department of Buildings ("DOB") during 2019.[62]

102.    At the September 2019 Hearing, Koch also acknowledged that NYCHA's elevator inspection and repair unit is "very resource-challenged." It has only ten certified elevator inspectors and 40 licensed elevator mechanics.[63] In fact, on the day of the September 2019 Hearing, it took Koch more than an hour and a half to obtain information as to how many elevators were currently out of service. When New York City Council Member Alicka Ampry-Samuel noted that the information Koch provided did not appear consistent with the information that was on NYCHA's website, Koch stated that the report she was referring to "might be stale."[64]

103.    The Monitor's First Report (Ex. E) found that this "significant shortage of [elevator] maintenance workers," coupled with the fact that "the existing NYCHA elevator portfolio is largely beyond its expected lifespan and/or otherwise in poor working condition,"

---

[61] Courtney Gross, *Out of Service: NY1 Investigation Finds Chronic Elevator Outages Plague NYCHA*, NY1 NEWS (Sept. 3, 2019), https://www.ny1.com/nyc/all- boroughs/politics/2019/09/03/out-of-service--ny1-investigation-finds-chronic-elevator-outages- plague-nycha.

[62] Transcript of the Minutes of the New York City Council Committee on Public Housing Jointly with the Committee on Mental Health, Disabilities, and Addictions, dated Sept. 4, 2019 ("Sept. 2019 Tr.") at 13:7-11, 119:14-19, 137:2-14.

[63] *Id.* at 71:12-13, 151:4-6.

[64] *Id.* at 63:18-22, 75:2-22.

make "[i]mmediate improvements in NYCHA elevator service … unlikely."[65] Further, the Monitor's Second Report (Ex. F) noted that NYCHA has plans to use funds allocated to NYCHA from New York State to fund the installation of 148 elevators in 10 NYCHA Developments. However, the HUD Agreement requires NYCHA to replace 297 elevators by 2025. That Report also found that aside from "the usual challenges of funding, there are broader challenges that make it questionable whether NYCHA can install 297 elevators in the next five years," such as the fact that "NYCHA may be unable to acquire the necessary items or the labor for the installation within that timeframe due to market limitations."[66]

104.    NYCHA's contemplated elevator replacements appear unlikely to remediate all of the problems with the elevators in the NYCHA Developments. There are more than 3,200 elevators in the NYCHA Developments, and at the September 2019 Hearing, Brian Honan, NYCHA's Director of the Office of Intergovernmental Relations, testified that more than two-thirds of the elevators are in fair or poor condition and, as such, likely to need repairs or replacement in the future.[67]

105.    The Monitor's Fifth Report Letter (Ex. I) noted that "NYCHA's 3200 elevators are some of the Authority's poorest performing assets, because so many are still in operation well past their intended lifespan" and that NYCHA's elevator department "typically make[s] multiple repair visits before finally correcting the root cause problem underlying the elevator breakdown," creating "increased total outage times and inefficient use of … staff who must keep responding to these same elevators."[68]

---

[65] Monitor's First Report (Ex. E) at 52.

[66] Monitor's Second Report (Ex. F) at 43.

[67] Sept. 2019 Tr. at 115:18-21, 132:3-15.

[68] Monitor's Fifth Report Letter (Ex. I) at 4.

106.    The elevator outages are also exacerbated by problems with the plumbing and electrical systems in the NYCHA Developments. As Koch explained at the September 2019 Hearing, on some occasions, roof leaks have resulted in the accumulation of water in the elevator shafts that caused outages. On other occasions, Con Edison reduces the voltage of electricity in the NYCHA Developments while performing maintenance work, leaving the buildings with insufficient electricity to power the elevators.[69]

107.    NYCHA's failure to repair the elevator systems in the NYCHA Developments continues to pose a significant health and safety risk to the Plaintiffs and prospective Class Members.

**F.    NYCHA Has Failed to Maintain Safe and Secure Premises.**

108.    Under the NYCHA Lease Agreements and Federal law, NYCHA has an obligation "[t]o maintain the common areas of the [NYCHA] Development[s] in a decent, safe, and sanitary condition" and "[t]o keep the [NYCHA] Development buildings, facilities and common areas … in a clean and safe condition." (Lease Agmt. §§ 13(a), (d)). Additionally, the Lease Agreements require NYCHA to comply with the Housing Standards, which provide that "common areas must be structurally sound, secure, and functionally adequate" and that "halls, corridors, [and] stairs must be … free of health and safety hazards, operable, and in good repair"; and "[e]ach dwelling unit within a building … must be structurally sound, habitable, and in good repair"; and "[a]ll areas and aspects of the dwelling unit, including the floors … walls, and windows[] must be free of health and safety hazards, functionally adequate, operable, and in good repair." 24 C.F.R. § 5.703(d)(1) and (e). Further, under the NYC Housing Code, NYCHA

---

[69] Sept. 2019 Tr. at 69:11-24.

must "provide a key lock in the entrance door to each dwelling unit" and equip each door of a dwelling unit with a chain door guard. N.Y.C. Admin. Code § 27-2043.

109.    The Lease Agreements also require NYCHA to comply with the MDL, which provides that each street-level entrance to a multiple dwelling "shall be equipped with one or more automatic self-locking doors," which "shall be locked at all times except when an attendant shall actually be on duty." MDL §§ 50-a(1), (3). The MDL further provides that every multiple dwelling with eight or more apartments "shall be equipped with an intercommunication system … located at an automatic self-locking door giving public access to the main entrance hall or lobby," which "shall consist of a device or devices for voice communication between the occupant of each apartment and a person outside said door to the main entrance hall or lobby and to permit such apartment occupant to release the locking mechanism of said door from the apartment." *Id.* §§ 50-a(2)-(3).

110.    Once again, NYCHA has repeatedly failed to ensure that common areas are in good repair, stairs are safe and that doors have locks that are secure. A 2018 audit of 299 NYCHA Developments by the New York City Comptroller found that nearly two-thirds (65%) had unsecured doors. Further, roughly one in five of the NYCHA Developments audited were also "severely vulnerable," with over half of their entrance doors unlocked. Additionally, nearly half (47%) of the NYCHA Developments did not have security cameras near their front entrances.[70]

111.    Although the audit recommended that NYCHA take steps to improve security at the NYCHA Developments, these problems have persisted. As of June 2019, more than a third

---

[70] Press Release, N.Y.C. Office of the Comptroller, Stringer Releases Investigative Survey of NYCHA Doors (Oct. 12, 2018), *available at* https://comptroller.nyc.gov/newsroom/stringer-releases-investigative-survey-of-nycha-doors.

(34%) of the NYCHA Developments did not have any security cameras.[71] Further, the cameras that have been installed in other NYCHA Developments have a life expectancy of approximately ten years, and some of the cameras were installed twenty years ago. At the June 2019 Hearing, when asked directly how many of the security cameras in the NYCHA Developments are currently operational, Carolyn Jasper ("Jasper"), NYCHA's Vice President of Public Housing Operations, stated that she could not say, and admitted that NYCHA had not recently conducted a survey to determine how many, if any, of the cameras were functioning.[72] Jasper also testified that, as of May 31, 2019, there were nearly 2,600 open work orders requesting repairs to broken doors in building entrances, exits and common areas.[73]

112.    During a June 2019 City Council hearing (the "June 2019 Hearing"), the president of the Tenants' Association at 1325 Franklin Avenue (Claremont Houses) in the Bronx provided the City Council with a picture of an exterior door with tape on its door lock and testified that the door had been broken for more than two years. She further testified that as a result of the broken door, "we have the homeless coming and using the stairways as public bathrooms," and that, in one incident, a homeless man choked a senior citizen in the building.[74]

113.    Also at the June 2019 Hearing, Jasper testified that the property managers and/or superintendents of the buildings in each of the NYCHA Developments are responsible for inspecting doors on a daily basis and putting in work orders for doors that are broken. However, Raymond Rodriguez, NYCHA's Director of the Office of Safety and Security, stated that he

---

[71] Transcript of the Minutes of the New York City Council Committee on Public Housing Jointly with the Committee on Public Safety, dated June 6, 2019 ("June 2019 Tr.") at 51:8-11.

[72] *Id.* at 50:13-51:19.

[73] *Id.* at 68:9-18.

[74] *Id.* at 20:2-25.

could not verify whether the daily inspections were actually being performed or whether property managers were putting in work orders.[75]

114.    The broken or missing locks, intercoms, and security cameras in the NYCHA Developments expose the Plaintiffs and prospective Class Members to a significant and foreseeable risk of criminal conduct by third parties, including, but not limited to, criminal trespass. In 2018, there were 979 arrests for criminal trespass in the NYCHA Developments and 5,671 arrests for index crimes (which include murder, rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft).[76] The numbers in 2019-2021 have been even greater.

### G.    NYCHA Has Failed to Repair and Maintain Smoke and Carbon Monoxide Detectors.

115.    Under the HUD Housing Standards, smoke detectors in common areas must be "operable and in good repair," and each "dwelling unit must include at least one battery-operated or hard-wired smoke detector, in proper working condition, on each level of the unit." 24 C.F.R. §§ 5.703(d)(4), (e). Likewise, the MDL provides that NYCHA must "equip each apartment … with approved and operational smoke detecting devices." MDL § 68(2)(a).

116.    Under the NYC Housing Code, NYCHA must "[p]rovide and install one or more approved and operational smoke detecting devices in each dwelling unit" and periodically replace such a device "upon the expiration of its useful life." N.Y.C. Admin. Code § 27-2045. NYCHA must also "provide and install one or more approved and operational carbon monoxide detecting devices in each dwelling unit and replace such devices" upon the expiration of their useful lives. N.Y.C. Admin. Code § 27-2045(1)(b)(1).

---

[75] *Id.* at 64:3-19, 65:23-66:17.

[76] *Id.* at 71:24-72:3, 83:11-14.

117. After a fire in the Butler Houses killed two young children, the DOI conducted an investigation of NYCHA's safety inspection practices in which the DOI re-inspected 240 apartments in five NYCHA Developments that had recently been inspected by maintenance workers. In total, more than half (53%) of the apartments had deficiencies in critical safety items, including numerous missing smoke and carbon monoxide detectors and missing or damaged fire safety notices.[77]

118. The DOI's investigation also found that original work orders for 104 of the 236 apartments that were inspected could not be located. In more than a quarter (29%) of the 136 inspections for which original work orders were available, NYCHA maintenance staff had failed to report that smoke or carbon monoxide detectors were missing, damaged or broken. Work orders for nearly a third of the apartments (30%) visited immediately following safety checks inaccurately reported that broken smoke and carbon monoxide detectors were functioning.[78]

119. At the conclusion of its investigation, DOI made five recommendations for changes to NYCHA's safety practices. Although NYCHA purported to accept the recommendations, problems with smoke and carbon monoxide detectors have continued. The 2018 DOH Investigation found that one in five inspected apartments had smoke and/or carbon monoxide detectors that were broken, had a low battery or were improperly located.[79] That situation has not been remedied.

---

[77] Mark G. Peters, Comm'r of N.Y.C. Dep't of Investigation, Smoke Alarm and Other Safety Deficiencies in NYCHA Public Housing: Routine Neglect of Safety Rules and Falsification of Documents by NYCHA Maintenance Staff (Oct. 2016), *available at* https://www1.nyc.gov/assets/doi/press-releases/2016/oct/31NYCHA_Smoke_Detectors_10-04-16.pdf.

[78] *Id.* at 5-6.

[79] 2018 DOH Investigation at 7.

120.    NYCHA's failure to install and repair smoke and carbon monoxide detectors in both individual units and in common areas continues to pose a significant risk to the Plaintiffs' health and safety.

### H.    NYCHA Has Failed to Remediate Problems with Pests.

121.    The Lease Agreements and applicable Federal Regulations require NYCHA to comply with the HUD Housing Standards, which provide that common areas must have "no evidence of infestation by rats, mice, or other vermin." 24 C.F.R. § 5.703(f). The Lease Agreements also require NYCHA to comply with the NYC Housing Code, which provides that NYCHA "shall keep the premises free from pests[.]" N.Y.C. Admin. Code § 27-2017.1. The NYC Housing Code further states that "the presence of cockroaches, mice or rats in any room in a dwelling unit in a multiple dwelling or a common area shall constitute an immediately hazardous violation of this code[.]" *Id.* § 27-2017.4(b).

122.    To eradicate pest problems, NYCHA must: "1. inspect for, and physically remove pest nests, waste, and other debris by High-Efficiency Particulate Air (HEPA) vacuuming, washing surfaces, or otherwise collecting and discarding such debris; 2. eliminate points of entry and passage for pests by repairing and sealing any holes, gaps or cracks in walls, ceilings, floors, molding, base boards … [and a]ttach door sweeps to any door leading to a hallway, basement, or outside the building to reduce gaps to no more than one-quarter inch; and eliminate sources of water for pests by repairing drains, faucets, and other plumbing materials that accumulate water or leak [and r]emove and replace saturated materials in interior walls." *Id.* § 27-2017.8(a).

123.    NYCHA repeatedly violates these obligations. For example, the 2018 DOH Investigation found that nearly half (47%) of inspected units contained insect infestations and nearly one in five (17%) contained evidence of rodents. The investigation further found that

nearly one-third (30%) of the units inspected contained severe issues with walls or flooring and noted that such issues could provide a potential route of entry for insects and rodents.[80]

124.    The Monitor's Second Report (Ex. F) found that NYCHA failed to comply with a provision of the Consent Decree requiring NYCHA to use Integrated Pest Management ("IPM") techniques to evaluate all units (and immediately adjacent units and common areas) with more than one verified pest infestation over a twelve-month period.[81] Because NYCHA was behind in conducting the inspections and remediations of pest conditions required by the Consent Decree, the Federal Monitor directed NYCHA to focus on immediately providing relief to 2,645 units with open work orders. As a result, the Monitor's Second Report found that NYCHA has made progress in "clearing its backlog for the most severe pest category, interior rats," but "much work remains for other pest types."[82]

125.    The Monitor's Second Report also found that "NYCHA … needs to establish an overall pest management structure to guide NYCHA's pest relief strategy across its whole portfolio," and that "NYCHA currently has no inspectors to at a minimum confirm that IPM work was done as represented and … signs of pest activity are no longer present and that an infestation was eradicated."[83]

126.    Very little if anything has been done since 2019 to remedy the pest problem plaguing all NYCHA developments. Compactors are too small, insufficient trash receptacles are provided and are not emptied frequently enough, and rats, mice and vermin roam and multiply throughout all of NYCHA's properties.

---

[80] *Id.* at 8-9.

[81] Monitor's Second Report at 44.

[82] *Id.* at 5.

[83] *Id.* at 50-51.

127.    NYCHA's failure to adequately address and remediate problems with pests continues to pose a significant risk to the health and safety of the Plaintiffs and prospective Class Members.

**I.    NYCHA's Has Failed to Provide Adequate Waste Receptacles and Clean Common Areas.**

128.    Under the Lease Agreements, HUD regulations and the NYC Housing Code, NYCHA has an obligation "[t]o provide and maintain appropriate receptacles and facilities … for the deposit of garbage, rubbish and other waste removed from the premises." (Lease Agmt. § 13(f)). The Lease Agreements further require NYCHA to comply with the NYC Housing Code, which provides that NYCHA must "not allow the accumulation except in a lawful receptacle of … any type of waste matter in any part of the premises." N.Y.C. Admin. Code § 27-2022. The NYC Housing Code also states that a variety of substances, including building materials, boxes, and food "which may afford harborage or provide food for such rodents or insects and other pests shall be kept stored or handled by [NYCHA]" in a manner to prevent the materials from attracting rodents or other pests. Id. § 27-2019.

129.    Additionally, the Lease Agreements require NYCHA to comply with the MDL, which requires NYCHA to "provide proper and suitable conveniences or receptacles for ashes, rubbish, garbage, refuse and other waste matter and shall arrange for the removal of such waste matter daily." MDL § 81(1). The MDL also requires that NYCHA "keep all and every part of a multiple dwelling, the lot on which it is situated, and the roofs, yards, courts, passages, areas or alleys appurtenant thereto, clean and free from vermin, dirt, filth, garbage or other thing or matter dangerous to life or health," and "keep clean at all times … every public or service part" of a multiple dwelling, "including every room, passage, stair, floor, window, door, wall, ceiling,

water-closet or toilet compartment, cesspool, drain, hall and cellar in such public or service part." *Id.* §§ 80(1)-(2).

130.    Numerous NYCHA Developments have inadequate receptables for waste. A 2019 survey of residents in 217 NYCHA Developments found that half of all residents reported there were not enough places to throw out trash. More than half (56%) reported that trash chute doors were too small, damaged, or dirty, and nearly half (46%) reported that overflowing trash disposal locations were an issue.[84]

131.    In December 2018, when two trash compactors broke at the Sotomayor Development in the Bronx, huge piles of trash accumulated and sat rotting for days. NYCHA took no action to remedy the problem until Bronx Borough President Ruben Diaz, Jr. posted a video of the problem on Twitter, which drew the attention of the news media. After the incident, a spokesperson for NYCHA told a local CBS News affiliate that NYCHA would "make sure it doesn't build up like this again."[85] But in August 2019, residents reported that trash was piling up outside of the Sotomayor Development once again.[86]

132.    Also in 2019, Washington Houses Residents Association President Claudia Perez wrote a letter to the Federal Monitor explaining that the Washington Development's trash compactors had been out of service for more than six months, and that workers were afraid to enter the compactor rooms to repair them for fear of being attacked by rats. The letter further stated that Residents continued to use the trash chutes even though the compactors were broken, which resulted in "garbage being filled all the way to the 14th floor of buildings." The Monitor's

---

[84] Public Works Partners, Trash Talk: Findings from Resident Waste Management Outreach (2019), *available at* https://www.publicworkspartners.com/wp-content/uploads/2019/04/Thrash-Talk.pdf.

[85] *Huge Garbage Pile at NYCHA Building Creates Awful Stench*, CBSN N.Y. (Dec. 30, 2018), https://newyork.cbslocal.com/2018/12/30/massive-pile-of-grabage-nycha-sonia-sotomayor- houses-bronx.

[86] Monica Morales, *Trash Piles Up at Bronx NYCHA Development*, PIX 11 NEWS (Aug. 8, 2019), https://pix11.com/2019/08/08/trash-piles-up-at-bronx-nycha-development.

First Report stated that these conditions are indicative of "the magnitude of NYCHA's pest challenges across its portfolio."[87]

133.    When the News 12 Network reported on August 30, 2019 that a broken trash compactor at the Castle Hill Houses in the Bronx had caused a fly infestation, the Federal Monitor investigated and found that a backed-up sewer line had caused the compactor room to be flooded to "at least the seven-foot mark." Because one of the hopper doors was unsecured, the garbage chute had become filled with waste while the compactor was out of service. Although the garbage was eventually removed from the chute, it was then stored in the basement for several days, exacerbating the problem.[88]

134.    Similarly, in September 2019, after receiving a report from a resident, the Federal Monitor found that a compactor outage in a high-rise building had caused garbage to pile up in the chute to the seventh floor. The Federal Monitor also learned a fire later broke out near one of the chute doors and in the chute itself,[89] and that a work order relating to the outage was closed before any repairs were completed.

135.    After conducting these investigations, the Federal Monitor, in his Second Report (Ex. F) concluded: "It is obvious that NYCHA needs to develop a procedure for a timely response to compactor outages, as well as interim measures to protect residents from the hazards of accumulating trash."[90] The Monitor's Second Report also found that NYCHA did not meet an August 1, 2019 deadline to begin inspecting the grounds and common areas of each building in the NYCHA Developments at least once every 24 hours for cleaning and maintenance needs,

---

[87] Monitor's First Report at 58; *see also id.* at App'x 6.

[88] Monitor's Second Report (Ex. F) at 61; *see also Broken Compactor Leads to Bug Problem in Castle Hill Houses*, NEWS 12 (Aug. 30, 2019), http://bronx.news12.com/story/40987365/broken- compactor-leads-to-bug-problem-in-castle-hill-houses.

[89] Monitor's Second Report (Ex. F0 at 58.

[90] *Id.* at 59.

including pests and trash, and remedy any deficiencies. As a result of NYCHA's failure to meet this obligation, in one notable incident, uncollected trash piled up in front of a playground.[91]

136.    The Monitor's Fifth Report Letter (Ex. I) noted that in many Developments, there is still a "constant presence of all kinds of trash strewn about, including bulk garbage, which also promotes the added problem of pest infestations" and that each Development needs to develop "its own waste management action plan that takes into account each unique development building layout, the available waste management facilities (compactors, bulk garbage crushers, card board bailers, etc.), and provides clear directives as to how and where trash and recyclables should be disposed of at the development."[92]

137.    NYCHA residents often see cockroaches, mice, rats, and other pests in the common areas and around the exterior of their buildings, especially in locations near where trash is stored. NYCHA's failure to provide additional waste collection receptacles, collect waste from receptacles in a timely manner, and keep common areas clean, continues to pose significant risks to the Plaintiffs' health and safety. See photos in Monitor's 8th Report (Exhibit S) at page 7.

### J.    NYCHA Has Failed to Provide Gas.

138.    The Lease Agreements, pursuant to HUD regulations, provide that NYCHA "shall furnish without additional cost … gas and electricity in normal quantities." (Lease Agmt. § 10). Yet NYCHA often fails to provide gas to the Residents and does not respond to their requests for gas service in a timely manner, when it responds at all. In one incident, approximately sixty families in the Red Hook Developments had their gas turned off. Despite repeated requests from

---

[91] *Id.* at 54-55.

[92] Monitor's Fifth Report Letter (ex. I) at 6.

the families, NYCHA did not restore the families' gas service for three months.[93] The same has happened to the tenants in 401-409 West 19th Street in the Fulton Houses in February 2021, where it took three months and litigation to get gas restored.

139.    NYCHA's failure to provide gas service to those families also provided further evidence of the inadequacy of the electrical systems in the NYCHA Developments. Although the families were provided with hot plates, the hot plates could not cook meals large enough for the families, and those who tried to use more than one hot plate blew the fuses in their units.[94]

140.    Residents in several other NYCHA Developments have faced similar gas outages. In May 2019, Residents of at least three buildings in the Marble Hill Development in the Bronx lost gas service for more than a month.[95] In August 2019, over 110 families at the Coney Island Development in Brooklyn were also without gas service for more than a month.[96] Of course, without gas to cook meals for themselves and/or their families, the Plaintiffs and other Residents must spend precious resources to order takeout or eat out.

141.    The failure to provide gas continues to poise health problems for NYCHA residents.

### K.    NYCHA's Has Failed to Make Necessary Repairs at All or Within a Reasonable Period of Time.

142.    In addition to the specific provisions discussed above, the Lease Agreements, as required by Federal law, impose a general obligation on NYCHA "[t]o make necessary repairs to

---

[93] *See* Scott Enman, *After Months Without Gas, Red Hook NYCHA Residents Demand Reimbursement*, BROOKLYN DAILY EAGLE (June 10, 2019), https://brooklyneagle.com/articles/2019/06/10/after-months-without-gas-red-hook-nycha-residents-demand-reimbursement.

[94] *Id.*

[95] Monica Morales, *Multiple Bronx NYCHA Buildings Haven't Had Gas for Weeks: Residents*, PIX 11 NEWS (May 11, 2019), https://pix11.com/2019/05/08/multiple-bronx-nycha-buildings- havent-had-gas-for-weeks-residents.

[96] Steven Klett, *Frontus, Tenants Anger Boils Over at NYCHA Gas Outage*, KINGS CNTY. POLITICS (Sept. 18, 2019), https://www.kingscountypolitics.com/frontus-tenants-anger-boils-over-at-nycha-gas-outage.

the Leased Premises." (Lease Agmt. § 13(c)) The Lease Agreements also provide that if the "Leased Premises is damaged to the extent that conditions are created which are hazardous to life, health, or safety of the occupants," NYCHA "shall repair the Leased Premises within a reasonable time." (*Id*. § 14(b)).

143.    The Lease Agreements further provide that "in circumstances where necessary repairs cannot be made within a reasonable time," NYCHA "shall offer standard alternative accommodations, if available." (*Id.* § 14(c)) The Lease Agreements then provide that if repairs are not made and alternative accommodations are not provided, "the rent shall abate during the period exceeding a reasonable time for repairs in which such repairs were not made, in proportion to the seriousness of the damage and loss in value as a dwelling."[97] (*Id.* § 14(d)).

144.    As discussed in detail above, NYCHA routinely fails to respond to the Plaintiffs and other Residents' requests for necessary repairs and does not make repairs within a reasonable time. NYCHA also fails to offer the Plaintiffs or other Residents any alternative accommodations or allow their rents to abate during the period in which repairs were not made. Publicly available data on NYCHA's website (see Exhibit J) indicates that from September 2018 to August 2021, the number of days required to make repairs in the NYCHA Developments has **more than quadrupled**—from 62 days to 283 days—and is well above NYCHA's target of 15 days.[98]

145.    The data on NYCHA's website (Exhibit J) also indicates that the number of open work orders in the NYCHA Developments has **increased by 100%percent**—from 223,610 in

---

[97] A rent abatement is an appropriate form of relief for these and other breaches of Plaintiffs' and other Residents' leases. *See, e.g.*, *VBH Luxury Inc. v. 940 Madison Assocs., LLC*, 2011 WL 6891584, at *1 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 13, 2011) (noting that plaintiff had "established prima facie that the defendant breached the lease in failing to maintain the [leased property]," and "[s]hould a breach be established, plaintiff would be entitled to recover monetary damages representing any diminution in the value of its leasehold, as a function of the rent set forth in the lease, arising out of such breach") (citing *Logan Advisors, LLC v. Patriarch Partnres, LLC*, 63 A.D.3d 440, 443 (1st Dep't 2009)). NYCHA Never abates tenant's rents despite its total failure to make timely repairs.

[98] NYCHA Metrics, N.Y.C. HOUS. AUTH., https://eapps.nycha.info/NychaMetrics/Charts/PublicHousingChartsTabs/ ?section=public_housing&tab=tab_repairs (last visited Oct. 7, 2019), and Exhibit M.

September 2018 to 548,120 in August 2021. In every month from September 2018 through August 2021, the number of work orders opened in the NYCHA Developments was greater than the number that were closed or cancelled. At the June 2019 Hearing before Judge Pauley, one NYCHA resident testified that although she had put in several work orders, she had been waiting for her closet, sink and toilet to be fixed for more than two years. This situation only worsened during the Pandemic.

146.    Moreover, it is likely that the publicly available data on NYCHA's website understates the scope of unresolved problems in the NYCHA Developments. The Monitor's First Report (Ex. E) "found that NYCHA's data is often incomplete, imprecise, and/or inaccessible, creating an inaccurate perception of NYCHA's performance" and that "often there is little, if any, correlation between closing work orders and completing the repair of a problem."

147.    The failure to make repairs to the heating systems within NYCHA is one of the most egregious ongoing failures of the Authority. Tenants go length periods of time without heat in the winter and without hot water year round. The Monitor noted this in his 10th Report, Exhibit U at page 2: "As reported below in the heating trend analysis report, there has been a significant increase in the number of heating outages, many of which were building-wide, as compared to the same period last heating season. Prolonged heat outages are unacceptable, particularly given the frigid temperatures we have had since the start of the year. .... In the offseason when boilers are generally not in use, NYCHA must conduct comprehensive inspections and complete all needed repairs. This past year we physically inspected close to 95% of NYCHA's boiler and tank rooms, and otherwise evaluated NYCHA's summer PM program. NYCHA's EHS and HUD also joined in this assessment process. As described in detail below,

we found that NYCHA's Heating Management Service Department (HMSD) staff often failed to follow their own established procedures to perform proper PM."

148.    NYCHA's repeated failure to respond to Plaintiffs and other Residents' requests for repairs in a timely manner, if at all, and to do necessary preventative maintenance, continues to pose a serious danger to the health and safety of the Plaintiffs.

## III.    NYCHA PACT/RAD Program

### A.    Description of the PACT/RAD Program

149.    In *Baez v. NYC Housing Authority,* ----F.Supp. 3d----, 2021 WL 1371793 (SDNY April 12, 2021), U.S. District Judge William Pauley described the PACT/RAD program as follows:

> Section 8 vs. Section 9 Housing
>
> The United States Department of Housing and Urban Development ("HUD") administers two major low-income housing programs that fund NYCHA Section 8 and Section 9. (Decl. of Gregory Russ in Opp'n to Mot. to Enforce, ECF No. 305 ("Russ Decl."), ¶ 5.) The Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, provides Section 9 federal funding for publicly owned and operated housing units. (See Russ Decl., ¶ 6.) The Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.*, provides Section 8 federal funding in the form of vouchers to low-income families who may subsidize their rent in privately owned and operated housing units. (See Russ Decl., ¶ 7.)
>
> In 2012, HUD launched the Rental Assistance Demonstration program ("RAD") funded by Section 8. (Russ Decl. - 18.) Instead of a voucher system for tenants, RAD disburses funding to public housing authorities to enter into long-term leases with private developers.
>
> Under RAD, HUD still subsidizes the tenants' rent payments and the local housing authority provides a subsidy to the developer. Developers renovate housing authority-owned properties with their own capital, and retain private property management companies to operate the developments. (See Russ Decl., ¶ 18.) To utilize RAD funds, NYCHA launched the Permanent

Affordability Commitment Together ("PACT") program in May 2015. (Russ Decl., ¶ 25.) Under the PACT program, NYCHA continues to own its housing portfolio but leases its buildings to private developers, who in turn renovate them and manage day-to-day operations.

Transfer to PACT

On May 19, 2015, NYCHA announced its first PACT project. (Russ Decl., ¶ 28.) As part of that project, NYCHA converted its Ocean Bay Apartments in Far Rockaway, Queens-totaling 1,395 units-from a NYCHA-operated Section 9 development to a PACT funded Section 8 development. (Russ Decl., ¶ 28.) In January 2017, NYCHA announced that it would convert 1,700 additional units in Brooklyn and the Bronx to PACT housing. (Russ Decl.-32.). On November 19, 2018-eleven days before this Court "so ordered" the Revised Consent Decree-NYCHA announced its intention to transition one-third of its housing portfolio-approximately 62,000 units-to PACT. (See Decl. of Erin M. Meyer in Supp. of Mot. To Enforce, ECF No. 295, Ex. B.)

As of February 3, 2021, 9,517 units-approximately 5% of NYCHA's housing portfolio-have been converted to PACT. (ECF No. 319, at 1-2.) NYCHA plans to transfer an additional 12,000 units to PACT by the end of 2022. (ECF No. 319, at 2.)

150.    One key element of the PACT/RAD program appears to be the fact that once the formerly Section 9 NYCHA units become Section 8 units owned by the RAD transferee, it opens the door to various funding streams from the Federal Government, most especially funding under the Low Income Housing Tax Credit Program ("LIHTCP"). According to HUD "the Low-Income Housing Tax Credit (LIHTC) program is the most important resource for creating affordable housing in the United States today. Created by the Tax Reform Act of 1986, the LIHTC program gives State and local LIHTC-allocating agencies the equivalent of approximately $8 billion in annual budget authority to issue tax credits for the acquisition, rehabilitation, or new construction of rental housing targeted to lower-income households." https://www.huduser.gov/portal/datasets/lihtc.html. The federal government issues tax credits to state and territorial governments. State housing agencies then award the credits to private

developers of affordable rental housing projects through a competitive process. Developers generally sell the credits to private investors to obtain funding. Once the housing project is placed in service (essentially, made available to tenants), investors can claim the LIHTC over a 10-year period. https://www.taxpolicycenter.org/briefing-book/what-low-income-housing-tax-credit-and-how-does-it-work. The Section 8 owners can also use funds from NYC Housing Development Corporation bonds; the NYC Housing Development Corporation is a public benefit corporation run by the State of New York which issues bonds which bring in money to finance low-income housing construction.

151.    NYCHA has pointed to the PACT/RAD program, up to now, as the only means by which it could raise the capital funds to do the $40 billion in repairs that it estimates need to be done to make the Section 9 housing livable. The PACT program, in essence, gives developers the right to build additional apartment buildings (containing mostly market rate apartments) on open spaces in the NYCHA developments, as long as they become Section 8 landlords and undertake repairs in existing buildings. Under Section 8 the tenants receive vouchers from the government which they give to the landlord, which gets paid whatever the tenants don't pay (tenants pay 30% of their income at most). The sums paid to the landlord under Section 8, and various Section 8 programs, and New York State bond programs described above, will exceed what HUD gives to NYCHA per apartment.

### B.    Harlem River Preservation LLC

152.    At Harlem River Houses an entity was created in April 2020 to be the RAD/ PACT developer, called Harlem River Preservation LLC ("HRP"). HRP is a partnership of at least four corporate entities: (a) C+C Apartment Management, LLC, a private property management company which manages thousands of residential units, most of which are funded

under the LIHTC; (b) the Settlement Housing Fund, a non-profit developer/owner created in 1971, which has a bevy of high-paid executives and which received 90% of its funds from "related organizations"; (c) West Harlem Group Assistance, a small non-profit which is half-funded by management fees and half-funded by government grants; and (d) L&M Builders, a multi-million dollar General Contractor, which is to be the General Contractor at Harlem River Houses. Tenants are not being asked to sign leases with HRP, they are being asked to sign leases with C+C, the private sector property manager, the only entity in HRP which seems designed to stick around after federal money is used, under Section 8, to perform renovations at Harlem River Houses.

### C.    Loss of Tenants' Rights Under RAD/PACT

153.    In the *Baez* case, NYCHA took the position that the protections of the mold Consent Decree were not applicable to RAD/PACT apartments. *Baez, supra,* at *7. Judge Pauley agreed, and refused to enforce the consent decree in buildings which had been transferred to PACT/RAD.

154.    It also seems clear that the HUD-NYCHA Consent Agreement (Exhibit D) also does not apply to PACT/RAD conversions. See paragraphs 14 and 15 of the agreement:

155.    The obligations of the Consent Agreement apply to apartment units, common areas, residential buildings, and building sites consisting of public housing owned or operated by NYCHA and receiving funding through Section 9 of the Housing Act.

156.    If, due to a conversion program, an apartment unit, common area, residential building, or building site is no longer operated by NYCHA and receiving funds through Section 9 of the Housing Act, then the obligations of the Consent Agreement shall no longer apply as to those conversions as of the closing of the applicable transaction.

157.    At Harlem River Houses, where all of the plaintiffs reside, the lease they are being asked to sign, annexed as Exhibit K, with C+C Apartment Management, LLC does not contain all of the protections of the NYCHA lease (Exhibit A) and the tenants have none of the statutory protections set forth in Section 9 of the Housing Action of 1937, protections which are sweeping in their scope, far more sweeping than the PACT/RAD lease which Plaintiffs are being asked to sign. For example, the Lease Agreement imposes a general obligation on NYCHA "[t]o make necessary repairs to the Leased Premises." (Ex. A Lease Agmt. § 13(c)). The Lease Agreement also provides that if the "Leased Premises is damaged to the extent that conditions are created which are hazardous to life, health, or safety of the occupants," NYCHA "shall repair the Leased Premises within a reasonable time." (*Id*.§ 14(b)). The Lease Agreements further provide that "in circumstances where necessary repairs cannot be made within a reasonable time," NYCHA "shall offer standard alternative accommodations, if available." (*Id*. § 14(c)). The Lease Agreements then provide that if repairs are not made and alternative accommodations are not provided, "the rent shall abate during the period exceeding a reasonable time for repairs in which such repairs were not made, in proportion to the services not provided."

158.    It is of major concern to Plaintiffs that their rights as Section 9 tenants will be severely compromised by the RAD conversion and their change to being Section 8 tenants. NYCHA tenants will begin to have different obligations and be governed by a different set of regulations as Section 8 tenants. NYCHA tenants will continue to have certain reporting obligations to NYCHA, which administers the Section 8 program, and other obligations to their new landlords. They will pay their rent to the new landlord, and will have to contact the new landlord about any repair issues. In fact, all existing work orders, i.e., repairs which tenants have requested to make their apartments habitable, will be erased, and new requests will have to be

made to the new landlord. The landlord-tenant relationship will be shifted to NYC Housing Court instead of to administrative proceedings before NYCHA staff with expertise. And, critically, NYCHA is so thrilled to escape from any responsibility for Harlem River Houses that it will provide no supervision of HRP and C+C.

159.    Although NYCHA tenants are being told that they will not be re-examined for their household income, they will be re-assessed to determine whether they are living in an apartment which is the right size for their household composition, under a process known as "rightsizing." Tenants whose apartments are selected for repair and renovation have a right to return to the same *property* but not necessarily the same unit. Rightsizing is likely to result in evictions of people who according to NYCHA's records, are not in the household composition. Although NYCHA officially has about 400,000 residents, unofficial estimates put that number closer to 600,000. RAD conversion will expose many of these long-time residents, many of whom are family members of leaseholders, with a right to remain, in the path of eviction proceedings.

### D.    Conversion Under HUD Regulations

160.    Conversion under RAD, if HUD regulations are followed, may not occur until the Public Housing Authority ("PHA") (here, NYCHA) has submitted a Plan, requiring multiple steps, to HUD, and HUD approves the plan. Conversion does not occur until there is a closing held only after the plan is approved by HUD.

161.    Under current HUD Regulations (see H-2019-09 PIH-2019-23(HA), Rental Housing Assistance REV-4 – Final Implementation), to be eligible for a RAD conversion a PHA must be "classified as a Standard or High Performer under the Public Housing Assessment System … If classified as 'troubled' … the PHA may still be eligible if it is making substantial

progress under its Recovery Agreement, Action Plan, Corrective Action Plan, or Memorandum of Agreement or proposes a revision to such agreement or plan that incorporates conversion under RAD and that is acceptable to HUD. HUD must have determined that factors resulting in the PHA's Troubled status will not affect its capacity to carry out successful conversion.

162.    Under those same regulations the PHA must perform a detailed physical inspection to determine short-term rehabilitation needs that will be completed as part of the RAD conversion and long-term capital needs. This assessment must be completed no earlier than 180 days after a Financing Plan is submitted to HUD.

163.    Additionally, under PL 112-55 (the Continuing Appropriations Act of 2012) as amended by PL 115-141 (the 2018 Amendments), as well as the aforementioned HUD regulations, the law (and HUD) requires ownership of a "Covered Project" by a public or non-profit entity, unless private ownership is needed to facilitate the use of tax credits AND the PHA preserves an interest in the property.

164.    Although Harlem River Preservation LLC was created just for Harlem River Houses conversion, it appears that the long-term RAD/PACT landlord will be C+C Apartment Management, LLC, which is not a non-profit entity, and the agreement it has with NYCHA, upon information and belief, leaves little or no genuine interest in Harlem River Houses with NYCHA or Harlem Preservation LLC; it is simply a conduit of public funds for a C+C project.

165.    In 2021, Plaintiffs, who organized as United Front Against Development, filed a series of complaints with HUD about what C+C Apartment Management, LLC and NYCHA were doing at Harlem River Houses. (See Exhibit L.)

166.    HUD advised Plaintiffs that as of August 2, 2021 (see Exhibit M), NYCHA had only submitted a "preliminary application" for the conversion of Harlem River Houses. HUD

informed Plaintiffs that "NYCHA has not yet submitted the fully detailed project proposal documentation for the possible conversion of Harlem River Houses," and that "[a]s a result HUD has not done a detailed review of the project proposal documents."

167.    HUD further advised Plaintiffs that it was conducting an investigation about whether the conversion process at Harlem River Houses was being handled in accordance with HUD regulations.

168.    Even in the early stages of this process, at Harlem River Houses, Harlem River Preservation LLC and C+C Apartment Management, LLC continued to push Plaintiffs and all other Harlem River Houses NYCHA tenants to sign their leases. They intrusively visited tenants' apartments, insisting that they have a right to enter in order to do a survey so that they could plan repairs, and, in many cases, using those visits as an opportunity to tell tenants that they would face eviction of they don't sign leases with C+C, which they say will come into effect when conversion occurs "in the Fall [of 2021]." Tenants have multiple notices posted on their apartment doors, are pressured to come to meetings with C+C, and are being told that repair orders they requested of NYCHA will have to be refiled with C+C and be reassessed.

169.    Beginning in June 2021, Plaintiffs, who had formed an organization called The United Front Against Displacement, began writing letters of complaint to HUD about C+C's actions, along with photographs, asking that HUD "approval of the RAD conversion" be withdrawn. See Exhibit L-1 and Exhibit L-2, an article in the *American Prospect*, a magazine, which featured a story about the manner in which many of the plaintiffs in this case were being treated. C+C was acting already as though they were in charge. On June 22, 2021 Plaintiffs wrote a group letter to HUD complaining about C+C's intimidating tactics. See Exhibit L-3.

170.    On August 2, 2021 a HUD staff member named Tai Merey Alex wrote back to Plaintiffs (see Exhibit M) stating that NYCHA had only submitted a "preliminary application," and that HUD would conduct a "fact-finding" concerning Plaintiffs' complaints. According to Alex, "Upon conclusion of our fact-finding, we will issue a findings letter that will include whether we have determined there to be program violations." She promised "appropriate action" if violations were found.

171.    On September 17, 2021 Counsel for Plaintiffs wrote to Ms. Alex supplying additional documentation in support of Plaintiffs' complaints, and asking that he be kept up to date. Also, Counsel made a FOIL request for a "copy of NYCHA's preliminary application regarding Harlem River Houses." See Exhibit N.

172.    In October 2021 HRP announced to tenants that it was going to begin repairs on apartments, which in many cases will require tenants to move out, without any assurance about whether they will return to their apartment or about how long they will be forced out of their apartment. And, in announcing these plans, HRP continued to pressure tenants to sign leases with C+C.

173.    On October 21, 2021, Plaintiffs' counsel made additional complaints, including about what had been announced by HRP in its October meeting, alleging that HRP was not the real entity in control of the RAD conversion at Harlem River Houses, a violation of PL115-141, and that NYCHA, as a Troubled PHA, was ineligible to supervise a RAD conversion. *See* Exhibit O. That letter also made an information request under the Freedom of Information Act for the results of HUD's investigation of the Plaintiffs' complaints and of counsel's complaint.

174.    On November 15, 2021 Ms. Alex responded (*see* Exhibit P), again stating that HUD was undertaking a "fact-finding" regarding the complaints, that the "current status" of the

submitted financial plan was "under review," and that a proposal to have tenants displaced from their apartments by C+C (complained about in Exhibit N) was under review. With respect to NYCHA's status as a Troubled Housing Authority and the ineligibility of C+C and Harlem River Preservation to act as an appropriate entity in the RAD conversion process, all Ms. Alex did was refer counsel back to the regulations that he alleged were being violated.

175.    On around February 18, 2022, C+C sent a notice to all tenants at Harlem River Houses, including Plaintiffs, advising them that "effective immediately, we are the new managing agent of Harlem River Houses." The leases that they demand that everyone sign is with them, not with Harlem River Preservation.

176.    No notice of the RAD conversion approval was given by HUD to the Plaintiffs or other tenants at Harlem River Houses. At no time were any of the Plaintiffs interviewed by HUD about their complaints, nor were they or their attorney furnished with copies of NYCHA's applications, financing plans, or the fact-finding results.

177.    There is no question that NYCHA intends to continue the PACT/RAD program so that it can eschew all responsibility to run the NYCHA developments, and convert the entire NYCHA property into privately owned Section 8 housing. Its ability to supervise what the new RAD owners are and will be doing is questionable, and its track record should create no confidence that it will act to protect the rights of its former tenants, as is its responsible to do under RAD.

## E.    Secretive Nature of the Process – Foil Violations

178.    On September 17, 2021 Counsel for Plaintiffs wrote a letter (Exhibit N), which, among other things, requested "a copy of NYCHA's preliminary application regarding Harlem River Houses."

179.    In his October 21, 2021 letter (Exhibit O), counsel for Plaintiffs asked HUD for the "results of its investigation of the complaints filed by the United Front Against Displacement."

180.    On November 15, 2021 Plaintiff's counsel responded to Ms. Alex's letter and asked for a response to his FOIL request. (*See* Exhibit Q.) Ms. Alex did not respond.

181.    Similar requests made to NYCHA (Exhibits R and V) were either avoided with use of doubletalk (Exhibit R is a series of emails asking for documents which were not properly responded to or avoided and Exhibit V is a letter sent by Counsel as a follow up which was never responded to), or just plain ignored.

182.    The entire approval process, besides being fraught with threats and mistreatment of Harlem River Houses tenants, and continued misfeasance and malfeasance by NYCHA, was also conducted entirely in secret, without any input from the tenants, and without any ability of the tenants to make meaningful complaints or review documents which were submitted by NYCHA, C+C or HRP.

## **INJURY**

183.    Plaintiffs minimally have a right to be tenants in a converted development run by a qualified non-profit, supervised by a public housing agency which has the ability and desire to supervise the new RAD landlord, approved by HUD in a transparent process. None of these things has occurred. This has caused irreparable injury to Plaintiffs and to the class of tenants they represent.

184.    The facts stated above are incorporated by reference into the Causes of Action set forth below.

## FIRST CAUSE OF ACTION

**(Implementation of RAD in Violation of 42 USC Section 1437f
and PL 112-55 as Amended and H-2019-09 PIH-2019-23(HA),
Rental Housing Assistance REV-4 – Final Implementation)**

185.   Under current HUD Regulations (*see* H-2019-09 PIH-2019-23(HA), Rental Housing Assistance REV-4 – Final Implementation), to be eligible for a RAD conversion a PHA must be "classified as a Standard or High Performer under the Public Housing Assessment System … If classified as 'troubled' … the PHA may still be eligible if it is making substantial progress under its Recovery Agreement, Action Plan, Corrective Action Plan, or Memorandum of Agreement or proposes a revision to such agreement or plan that incorporates conversion under RAD and that is acceptable to HUD. HUD must have determined that factors resulting in the PHA's Troubled status will not affect its capacity to carry out successful conversion."

186.   After having been accused by HUD, in *United States v. NYCHA*, of being a Troubled PHA, and conceding the underlying facts, which were probably criminal in nature, NYCHA has not made substantial progress under the court-unapproved Consent Agreement to be eligible for a RAD conversion.

187.   Under those same regulations the PHA must "perform a detailed physical inspection to determine short-term rehabilitation needs that will be completed as part of the RAD conversion and long-term capital needs." This assessment must be completed "no earlier than 180 days *after* a Financing Plan is submitted to HUD."

188.   At no time within the 180 days after NYCHA submitted its RAD Financing Plan for Harlem River Houses did it do the required assessment.

189.   Given these facts, the approval by HUD of the Harlem River Houses conversion was arbitrary, capricious and in violation of applicable law.

## SECOND CAUSE OF ACTION

**(Implementation of RAD in Violation of 42 USC Section 1437f
and PL 112-55 as Amended)**

190.    Under PL 112-55 (the Continuing Appropriations Act of 2012) as amended by PL 115-141 (the 2018 Amendments), as well as the aforementioned HUD regulations, the law (and HUD) requires ownership of a "Covered Project" by a public or non-profit entity, unless private ownership is needed to facilitate the use of tax credits AND the PHA preserves an interest in the property.

191.    Although Harlem River Preservation LLC was created just for Harlem River Houses conversion, it appears that the long-term RAD/PACT landlord will be C+C Apartment Management, LLC, which is not a public or non-profit entity, and the agreement it has with NYCHA, upon information and belief, leaves little or no genuine interest in Harlem River Houses with NYCHA or Harlem River Preservation LLC; HRP is simply a conduit of public funds for a C+C project. C+C itself is not a qualified owner of Harlem River Houses as converted, nor has NYCHA preserved a genuine interest in the property. In fact, NYCHA is incapable of playing a meaningful role in the operation or supervision of Harlem River Houses.

192.    Given these facts, the approval by HUD of the Harlem River Houses conversion was arbitrary, capricious and in violation of applicable law.

## THIRD CAUSE OF ACTION

**(Violation of FOIL)**

193.    Defendant HUD had an obligation under the Freedom of Information Law to respond in a timely manner to requests for non-protected documents. By failing to provide the documents requested, including NYCHA's Financing Plan, and the results of its "Fact-Finding" regarding Plaintiffs' complaint, HUD has violated the Freedom of Information Law and has shrouded the entire conversion process in unnecessary and unlawful secrecy.

## CLASS ACTION ALLEGATIONS

194.   Plaintiffs bring their claims on behalf of a class of similarly situated persons, to wit: tenants of Harlem River Houses who have leases pursuant to Section 9 of the Federal Housing Act of 1937.

195.   A class action is appropriate because:

    a.      the class is so numerous that joinder of all members is impracticable;

    b.      there are questions of law or fact common to each member of the class;

    c.      the claims or defenses of the representative parties are typical of the claims or defenses of each class;

    d.      the representative parties will fairly and adequately protect the interests of each class;

    e.      inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing each class;

    f.      adjudications with respect to individual members of each class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

    g.      the parties opposing each class have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each class as a whole.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray that this Court:

1.      Enter a Preliminary Injunction and Permanent Injunction reversing approval by HUD of the RAD Conversion of Harlem River Houses;

2.      Enter Judgment declaring NYCHA is not eligible to participate in the RAD conversion process, and the Harlem River Preservation is not an eligible owner of a RAD property;

3.      Enter judgment directing HUD to supply Plaintiffs with the documents they requested under the FOIL, and enjoining HUD from future violations of the FOIL rights of tenants who request detailed information about RAD conversions, and about investigations of RAD-related complaints made by tenants;

4.      Award the Plaintiffs' counsel reasonable attorneys' fees and costs; and

5.      Grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
        March 11, 2022

ADVOCATES FOR JUSTICE
Attorneys for Plaintiffs

By: /s/ Arthur Z. Schwartz
      Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@afjlaw.com

## <u>VERIFICATION</u>

ARTHUR Z. SCHWARTZ, an attorney at law duly admitted to the Bar of the State of New York, declares under the penalty of perjury that: I am counsel to Plaintiffs. I have read the Complaint, and the same is true to my knowledge, information, and belief. My knowledge is gained from interviews with the Plaintiffs, visits to their residences, review of Court filings and reports, and review of records provided by the Plaintiffs.

Dated: New York, New York
      March 11, 2022

                              /s/ *Arthur Z. Schwartz*
                              ARTHUR Z. SCHWARTZ