UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LYDIA GONZALEZ DIAZ, et al.,

                    Plaintiffs,

-against-

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
et al.,

                    Defendants.

---

No. 22-CV-2051 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court are Defendants New York City Housing

Authority ("NYCHA"),[1] United States Department of Housing and

Urban Development ("HUD"),[2] C+C Apartment Management L.L.C.

("C+C") and Harlem River Preservation L.L.C.'s ("HRP")[3] motions

to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1)

---

[1] (See Notice of Defendant NYCHA's Motion to Dismiss the Amended
Verified Class Action Complaint ("NYCHA MTD"), dated May 27,
2022 [dkt. no. 27]; Memorandum of Law in Support of Defendant
NYCHA's Motion to Dismiss the Amended Verified Class Action
Complaint ("NYCHA Br."), dated May 27, 2022 [dkt. no. 28];
Joinder to the Reply Memorandum in Further Support of HUD's
Motion to Dismiss the Amended Verified Class Action Complaint
("NYCHA Joinder"), dated August 22, 2022 [dkt. no. 48].)

[2] (See HUD's Notice of Motion ("HUD MTD"), dated May 27, 2022
[dkt. no. 29]; Defendant HUD's Memorandum of Law in Support of
its Motion to Dismiss the Amended Verified Class Action
Complaint ("HUD Br."), dated May 27, 2022 [dkt. no. 30];
Defendant HUD's Reply Memorandum of Law in Further Support of
its Motion to Dismiss the Amended Verified Class Action
Complaint ("HUD Reply"), dated August 18, 2022 [dkt. no. 46].)

[3] (See C+C's Notice of Motion ("C+C MTD"), dated May 31, 2022
[dkt. no. 38].)

and 12(b)(6).  Plaintiffs oppose the motions.[4] For the reasons

below, the motions to dismiss are GRANTED.

**I.    Background**

This action concerns the Harlem River Houses, a public

housing authority ("PHA") development funded under Section 9 of

the Housing Act of 1937 originally owned and managed by NYCHA.

(Dkt. no. 4 at ¶ 1.)[5] Plaintiffs seek injunctive relief,

challenging HUD's approval of NYCHA's plan to convert Harlem

River Houses into a privately owned and managed development

corporation funded under Section 8 of the Housing and Community

Development Act of 1974, 42 U.S.C. § 5301 et seq. (Id.)

HRP was created in April 2020 to be the RAD/PACT developer

for the Harlem River Houses conversion. (AC at ¶ 152.)

> HRP is a partnership of at least four corporate entities:
> (a) C+C Apartment Management, LLC, a private property
> management company which manages thousands of
> residential units, most of which are funded under the
> LIHTC; (b) the Settlement Housing Fund, a non-profit
> developer/owner created in 1971, which has a bevy of
> high-paid executives and which received 90% of its funds
> from "related organizations"; (c) West Harlem Group
> Assistance, a small non-profit which is half-funded by
> management fees and half-funded by government grants;
> and (d) L&M Builders, a multi-million dollar General
> Contractor, which is to be the General Contractor at

---

[4] (See Plaintiffs' Memorandum of Law in Opposition to the Motions
to Dismiss ("Pl. Opp."), dated July 22, 2022 [dkt. no. 44];
Plaintiffs' Sur-Reply Memorandum of Law in Opposition to the
Motions to Dismiss ("Pl. Sur-Reply"), dated August 27, 2022
[dkt. no. 50].)

[5] (Amended Verified Class Action Complaint ("AC"), dated March
11, 2022.)

> Harlem River Houses. Tenants are not being asked to sign
> leases with HRP, they are being asked to sign leases
> with C+C, the private sector property manager, the only
> entity in HRP which seems designed to stick around after
> federal money is used, under Section 8, to perform
> renovations at Harlem River Houses.

(Id.)

A. **Plaintiffs' Communications with HUD and Issues with HRP**

In 2021, Plaintiffs organized as United Front Against
Displacement and lodged "a series of complaints[6] with HUD about
what C+C Apartment Management, LLC and NYCHA were doing at
Harlem River Houses." (AC at ¶ 165.) The two emails attached as
exhibits to the AC complained of "intimidation" and "harassment"
by C+C trying to pressure Plaintiffs into signing the new
private leases. (Dkt. nos. 4-12 and 4-14.) The AC alleges that
the C+C lease "does not contain all of the protections of the
NYCHA lease (Exhibit A) and the tenants have none of the
statutory protections set forth in Section 9 of the Housing

---

[6] (The AC cites to Exhibit L, which contains three documents.
First, a June 22, 2021 email from "nogonyc@riseup.net" addressed
to the "HUD Special Projects Center" that allegedly attached a
letter from Harlem River Houses tenants "requesting that HUD
withdraw approval of RAD conversion" due to inadequate tenant
engagement and reports that C+C had the second highest eviction
rate in New York City. [Dkt. no. 4-12.] Second, an article in
the American Prospect titled "Public Housing Is Going Private-
and Residents are Fighting Back" that discusses the RAD program
and the tenant organizing around the Harlem River Houses
conversion. [Dkt. no. 4-13.] Third, a June 30, 2021 email from
the same "nogonyc" email address addressed to the HUD Special
Projects Center allegedly attaching several letters from Harlem
River Houses residents requesting that HUD withdraw approval of
the RAD conversion. [Dkt. no. 4-14.])

Act[] of 1937." (AC at ¶ 157.) The AC alleges that

representatives of HRP and C+C:

> continued to push Plaintiffs and all other Harlem River
> Houses NYCHA tenants to sign their leases. They
> intrusively visited tenants' apartments, insisting that
> they have a right to enter in order to do a survey so
> that they could plan repairs, and, in many cases, using
> those visits as an opportunity to tell tenants that they
> would face eviction of [sic.] they don't sign leases
> with C+C, which they say will come into effect when
> conversion occurs 'in the Fall [of 2021].' Tenants have
> multiple notices posted on their apartment doors, are
> pressured to come to meetings with C+C, and are being
> told that repair orders they requested of NYCHA will
> have to be refiled with C+C and be reassessed.

(AC at ¶ 168.)

On August 2, 2021, Taí Merey Alex of the HUD Office of

Recapitalization responded to Plaintiffs' June 22, 2021 email.

(Dkt. no. 4-15.) Alex informed Plaintiffs that HUD would

investigate the claims set out in Plaintiffs' email and attached

letter and, at the conclusion of the investigation, HUD would

issue a findings letter that would include whether HUD

determined there to be program violations. (Id.) Alex further

assured Plaintiffs that if HUD found non-compliance with RAD

program requirements or HUD regulations, HUD would "take

appropriate actions" in response. (Id.) Alex noted that while

NYCHA had submitted the "preliminary application," NYCHA had not

then submitted the full project proposal, and as a result, HUD

had not yet done "a detailed review of the project proposal

documents." (Id.) Finally, Alex instructed Plaintiffs to send

any future correspondence about RAD to Alex's email address and requested contact information for Plaintiffs' primary contact so that HUD could "communicate with [Plaintiffs] effectively during [HUD's] fact-finding." (Id.) On September 17, 2021, Plaintiffs' Counsel responded to Alex's August 2, 2021 email, asking that he be kept up to date on HUD's investigation. (Dkt. no. 4-16.)

In October 2021, HRP announced that it would begin repairs on apartments, that in "many cases" the repairs would require tenants to move out, and HRP did not provide any assurances about whether tenants would return to their apartments or how long tenants would be "forced out" of their apartments. (AC at ¶ 172.) Plaintiffs' counsel then emailed Alex complaining of the relocations, alleging that C+C was the real entity in control of the RAD conversion and asserting that NYCHA was ineligible to supervise a RAD conversion due to its status as a troubled PHA. (Dkt. no. 4-18.)[7] Alex responded on November 15, 2021. Alex informed Plaintiffs' counsel that HUD was conducting a fact-finding to investigate specific items raised to HUD by residents, that the submitted financial plan was under review, and that C+C's proposed relocation was under review. (Dkt. no.

---

[7] (The AC cites to Exhibit O. However, the document in question appears to be Exhibit P, a letter from Arthur Schwartz emailed to Alex on October 21, 2021.)

4-17.)[8] Regarding Plaintiffs' counsel's statements on NYCHA's status as a troubled PHA, Alex referred Plaintiffs' counsel to the RAD Notice. (Id.)

Around February 18, 2022, C+C sent notice to all Harlem River Houses tenants that it was the new managing agent of Harlem River Houses. (AC at ¶ 175.) Plaintiffs allege that HUD did not give them any notice of the RAD conversion approval, that Plaintiffs were not interviewed by HUD regarding their complaints, and that neither they nor Plaintiffs' counsel were given copies of NYCHA's applications, financing plans, or the fact-finding results. (Id. at ¶ 176.)

Plaintiffs allege that:

> [T]heir rights as Section 9 tenants will be severely compromised by the RAD conversion and their change to being Section 8 tenants. NYCHA tenants will begin to have different obligations and be governed by a different set of regulations as Section 8 tenants. NYCHA tenants will continue to have certain reporting obligations to NYCHA, which administers the Section 8 program, and other obligations to their new landlords. They will pay their rent to the new landlord, and will have to contact the new landlord about any repair issues. In fact, all existing work orders, i.e., repairs which tenants have requested to make their apartments habitable, will be erased, and new requests will have to be made to the new landlord. The landlord-tenant relationship will be shifted to NYC Housing Court instead of to administrative proceedings before NYCHA staff with expertise.

---

[8] (The AC cites to Exhibit P. However, the document in question appears to be Exhibit O, a letter from Alex emailed to Schwartz on November 15, 2021.)

(AC at ¶ 158.)

Further, Plaintiffs take issue with a process called "rightsizing," which Plaintiffs allege C+C will undertake after it begins managing the Harlem River Houses. (AC at ¶ 159.) Rightsizing involved reassessing tenants to "determine whether they are living in an apartment which is the right size for their household composition." (Id.) Plaintiffs allege that "[t]enants whose apartments are selected for repair and renovation have a right to return to the same property but not necessarily the same unit. Rightsizing is likely to result in evictions of people who according to NYCHA's records, are not in the household composition." (Id.)

**B. Legal Authority for the Conversion**

NYCHA's conversion plan is authorized under the federal Rental Assistance Demonstration ("RAD") program, implemented by NYCHA under the moniker Permanent Affordability Commitment Together ("PACT"). (AC at ¶ 2.) Under RAD, HUD subsidizes tenants' rent payments and NYCHA provides a subsidy to the private developer. The developer then renovates the housing with its own capital and retains private property management companies to operate the development. (Id. at ¶ 149.) Under PACT, NYCHA owns the housing and leases it to the private developers. (Id.)

Before a PHA can convert a development under RAD, the PHA must submit a plan to HUD, HUD must approve the plan, and the conversion must close. (Id. at ¶ 160.) HUD regulations limit RAD eligibility to PHAs that are:

> classified as a Standard or High Performer under the Public Housing Assessment System (PHAS). If classified as "troubled" (Troubled) the PHA may still be eligible if the PHA is making substantial progress under its Recovery Agreement, Action Plan, Corrective Action Plan (CAP) or Memorandum of Agreement (MOA) or proposes a revision to such agreement or plan that incorporates conversion under RAD and that is acceptable to HUD. HUD must have determined that the factors resulting in the PHA's Troubled status will not affect its capacity to carry out a successful conversion under this Demonstration.[9]

HUD regulations further require each project selected for a RAD award to perform a "detailed physical inspection" that "must have been completed no earlier than 180 days prior to submission of the Financing Plan, except with HUD approval." (RAD Notice at 23.) Finally, HUD regulations require that:

> [e]xcept where permitted to facilitate the use of tax credits, during both the initial term and all renewal terms of the HAP Contract, HUD will require ownership or control of the Covered Project by a public or non-profit entity. HUD may also allow ownership of the project to be transferred to a tax credit entity controlled by a for-profit entity to facilitate the use of tax credits for the Covered Project, but only if HUD determines that the PHA or a non-profit entity preserves an interest in the property.

---

[9] Rental Assistance Demonstration—Final Implementation, Revision 4 (H-2019-09 PHI-2019-23 (HA)) (Sept. 5, 2019) ("RAD Notice"), Section 1.3, at 22, available at https://www.hud.gov/sites/dfiles/Housing/documents/H-2019-09-PIH-2019-23_RAD_Notice%20Rev4_20190905.pdf.

(Id. at 30.)

### C. Plaintiffs' Causes of Action

Plaintiffs assert that they "have a right to be tenants in a converted development run by a qualified non-profit, supervised by a public housing agency which has the ability and desire to supervise the new RAD landlord, approved by HUD in a transparent process." (AC at ¶ 183.) Plaintiffs write that the fact that none of these rights has been met has caused Plaintiffs "irreparable injury." (Id.)

Both of Plaintiffs' causes of action assert that HUD's approval of the Harlem River Houses conversion was "arbitrary, capricious and in violation of applicable law." (Id. at ¶¶ 189 and 192.) Plaintiffs base their first cause of action on what they assert is NYCHA's status as a Troubled PHA, NYCHA's failure to make substantial progress under a Consent Agreement (id. at ¶ 186), and NYCHA's failure to do a required "detailed physical inspection" (id. at ¶¶ 187-188). Plaintiffs based their second cause of action on their assertion that C+C, a private, for-profit entity, will be the "long-term RAD/PACT landlord" and that the Harlem River Houses conversion will leave "little or no genuine interest in Harlem River Houses with NYCHA or [HRP]." (Id. at ¶ 191.)

Seeking relief, Plaintiffs pray the Court will enter a preliminary and permanent injunction reversing HUD's approval of the RAD conversion of Harlem River Houses, declare NYCHA ineligible to participate in the RAD conversion process, and declare HRP ineligible to own a RAD property. (AC at 69.)

## II.  Legal Standard

On May 27, 2022, HUD moved to dismiss the AC,[10] asserting that Plaintiffs lack constitutional standing under Article III to challenge HUD's approval of the RAD Conversion of Harlem River Houses. (HUD Br. at 17.) HUD argues that Plaintiffs failed to establish legally cognizable injury in fact (id. at 18) and that Plaintiffs' allegations regarding HUD's approval of the RAD Conversion are not likely to be redressed by a favorable judicial decision (id. at 22). Because the motion can be resolved on redressability grounds, the Court will not reach the question of whether Plaintiffs have properly alleged an injury in fact.

### A.  Motion to Dismiss under FRCP 12(b)(1)

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable

---

[10] Defendants NYCHA and C+C also each moved separately to dismiss the AC. However, only HUD's papers provide substantive arguments regarding dismissal. Therefore, the Court will reference only HUD's papers.

inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014) (citing Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir.2011) (per curiam)). "[A] plaintiff asserting standing must 'allege facts that affirmatively and plausibly suggest that [she] has standing to sue' and courts 'need not credit a complaint's conclusory statements without reference to its factual context.'" Soule by Stanescu v. Connecticut Association of Schools, Inc., 57 F.4th 43, 50 (2d. Cir. 2022) (quoting Conn. Parents Union v. Russell-Tucker, 8 F.4th 167, 172 (2d Cir. 2021)).

**B. Constitutional Standing Under Art. III**

"[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citation omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to

support the claim.'" Id. "The elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court." Dickerson v. Feldman, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

### i. **Redressability**

"To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." California v. Texas, 141 S. Ct. 2104, 2115 (2021) (quoting Allen v. Wright, 468 U.S. 737, 753 n.19 (1984)).

> The 'fairly traceable' and 'redressability' components of the constitutional standing inquiry were initially articulated by this Court as 'two facets of a single causation requirement.' To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested.

Allen, 468 U.S. at 753 n.19. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998). However, plaintiffs need not show that a favorable decision would relieve their every injury (see Larson v. Valente, 456 U.S. 228, 243 n.15 (1982)) or that judicial relief would entirely remedy an injury (Massachusetts v. E.P.A., 549 U.S. 497, 526 (2007)).

III. **Discussion**

HUD argues that, assuming Plaintiffs were able to establish a cognizable legal injury from the RAD conversion, Plaintiffs' requested relief would not be redressed by a favorable decision from this Court. HUD writes that even if the Court were to reverse or set aside HUD's approval of the Harlem River Houses RAD conversion, "Harlem River Houses cannot be returned to Section 9, and the Court lacks the equitable powers to rescind the complex corporate and financial transactions that have already been effectuated," and "any attempt to do so would exacerbate the harm to residents of the Harlem River Houses." (HUD Br. at 22.)

In supporting its argument regarding the limits of the Court's equitable powers, HUD cites a list of cases establishing that courts "lack the power, once a bell has been rung, to unring it." (Id. at 23 (citing Presidential Gardens Assocs. v. United States, 175 F.3d 132, 143 (2d Cir. 1999).) HUD further specifies that federal courts have routinely rejected requests to rescind complex corporate, financial, and real estate transactions once they have closed. (Id. at 23-24.) In Bank of N.Y. Co. v. Ne. Bancorp, Inc., Bank of New York Co. ("BNY") sought to enjoin the merger of Northeast and First Fidelity Bancorporation. 9 F.3d 1065, 1066 (2d Cir. 1993). Judge Covello of the District of Connecticut denied BNY's motion for a

preliminary injunction and the merger was completed. Id. BNY
then appealed Judge Covello's denial of the motion for
preliminary injunction and, because the merger had already been
completed, sought to transform the motion into an application
for recission. Id. at 1066-67. The Court of Appeals held that
"where a merger had been consummated, restoration of the status
quo may be impossible" due to the "commingling of assets and
other substantial changes in the structures of the enterprise
involved." Id. at 1067 (citing FTC v. Exxon Corp., 636 F.2d
1336, 1342-43 (D.C. Cir. 1980). Similarly, in Presidential
Gardens, the Court of Appeals held that the district court
"lacked jurisdiction to issue an injunction to hold trust funds
when the trust corpus no longer existed, and could not issue an
injunction to enjoin an auction that had already taken place.
Therefore, the claims for injunctive relief were properly
dismissed." 175 F.3d at 144.

In this case, HUD asserts that the structure and
transactions necessary for Harlem River Houses' RAD conversion
"have already been effected and are too integrated and too far
advanced to be unwound." (HUD Br. at 24.) Among the relevant
transactions are: 1) a ground lease between NYCHA, HRP, and
Harlem River Housing Development Fund Company, Inc.; 2) HRP's
corporate structure, which allocated investment, risk, and
control of the project among NYCHA, several non-profit entities,

and for-profit investors, and included a master-tenant
relationship that facilitated a nearly $63 million investment by
Chase Community Investments, LLC; 3) several mortgages, loans,
and other forms of debt in excess of $209 million to fund
acquisition and rehabilitation of the project; and 4) a
management contract with C+C that replaces NYCHA's now-disbanded
workforce for the property. (Id. at 24-25.) HUD also argues that
Harlem River Houses "cannot simply be restored to the Section 9
public housing program." (Id. at 26.) If NYCHA were to try to
return Harlem River Houses to Section 9, HUD regulations would
require NYCHA to complete a detailed development plan that
allowed HUD

> to determine the project would be financially
> sustainable, provide safe and sanitary housing, and meet
> a multitude of other requirements, including
> accessibility, environmental suitability, compliance
> with the Fair Housing Act—requirements that are very
> much in doubt given the anticipated physical and
> financial state of the property if the conversion were
> rescinded.

(Id. at 26-27, (citing 24 C.F.R. §§ 905.600, 905.602, 905.606,
905.610).) HUD notes that Section 9 projects are required to
record a declaration of trust in first position, which would be
impossible in this case because "[t]he original declarations of
trust were released concurrent with the closing for the RAD
conversion and any new declarations of trust would be
subordinate to dozens of encumbrances recorded in the interim,

including over 40 mortgages, use agreements, regulatory agreements, memorandums of lease, and subordination agreements." (Id. at 27) HUD also writes that HUD must approve NYCHA's mortgage payments based on HUD's determination that NYCHA has the ability to make the payments and HUD could not grant approval for Harlem River houses, which would be "unable to service its debt without the increased subsidies flowing from the RAD conversion." (Id.)

Finally, HUD asserts if this Court were retroactively to enjoin the transactions and order Harlem River House's return to HUD's Section 9 program, it would only exacerbate the harm to the project and its residents. (HUD Br. at 25.) HUD writes that such a return would result in a nearly $6 million reduction in annual subsidies that would "render the project insolvent and its operations unsustainable," leaving the project vulnerable to foreclosure by the lenders if it failed to meet its debt service obligations. (Id. at 25-26.)

Plaintiffs respond that "[i]f HUD is right here, then an APA case could never be brought concerning a RAD conversion approval" because there was no waiting period between when HUD announced its approval of the RAD conversion and when the conversion closed. (Pl. Opp. at 35.) Plaintiffs further argue that HUD has not made any showing that relief is impossible because "the key parties are all before the Court, and all of

the matter [sic.] undertaken (mortgages and repairs) involve money." (Id.) Plaintiffs write that "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief." (Id. (citing Savoie v. Merchants Bank, 84 F.3d 52, 58-59 (C.A.2 1996), and in Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 509-10 (C.A.2 (N.Y.) 2005).) In particular, Plaintiffs rely on Savoie, which held that where the defendant Bank had notice that a $500,000 set-aside was requested and the magistrate judge had recommended the issuance of a preliminary injunction compelling such a set-aside, "the District Court had power to restore the status quo ante by entering a preliminary injunction ordering the Bank to escrow $500,000." Savoie, 84 F.3d at 58-59.

HUD replies that Plaintiffs never sought to enjoin the conversion of Harlem River Houses. (HUD Reply at 12.) HUD writes that "Plaintiffs seek to 'revers[e]' HUD's approval of the conversion of Harlem River Houses, and presumably have the Court restore the Harlem River Houses to the Section 9 program. Nowhere in plaintiffs' opposition brief do they explain how this would be accomplished." (HUD Reply at 12-13.) HUD rejects Plaintiffs' analogy to Savoie, arguing that Plaintiffs' complaints to HUD about the conversion, HUD's assurances to Plaintiffs that they would be kept apprised of developments, and

Plaintiffs' lawsuit against NYCHA does not equate to the circumstances in Savoie, where the defendant bank had notice of the preliminary injunction proceedings and the magistrate judge's report and recommendation. (HUD Br. at 14.)

The Court agrees with HUD's analysis. Plaintiffs bear the burden of establishing the elements of constitutional standing, Lujan, 504 U.S. at 561, and the Court "need not credit a complaint's conclusory statements without reference to its factual context," Conn. Parents Union, 8 F.4th at 172. Here, Plaintiffs did not meet their burden because they failed to establish that the injuries they alleged were likely to be redressed by a favorable decision from this Court.

Plaintiffs ask the Court to enjoin the RAD conversion of Harlem River Houses. However, the conversion is already complete and has been effected through multiple transactions that have changed Harlem River Houses' corporate structure, generated debt greater than $209 million, and released the project's original declarations of trust. There has been a "commingling of assets and other substantial changes in the structures of the enterprise involved." Bank of N.Y. Co., 9 F.3d at 1067. In like circumstances, the Court of Appeals has held that courts "lack the power, once a bell has been rung, to unring it." Presidential Gardens, 175 F.3d at 143. Thus, Plaintiffs' alleged injuries are not likely to be redressed by a favorable judicial

decision, Plaintiffs lack standing to bring their suit, and their Amended Complaint is dismissed for lack of subject matter jurisdiction.

Plaintiffs' reliance on Savoie is misplaced. Savoie involved a motion for a preliminary injunction aimed at restoring the status quo when a bank that was party to the case was aware that an injunction had been sought and nevertheless took action that the injunction would have precluded. Savoie, 84 F.3d at 54. Further, the relief requested in Savoie was only that the bank escrow $500,000 to facilitate an award of attorney's fees that might have been subsequently made, id., and it appeared that none of the parties believed it was out of the bank's power to escrow that amount of money. Here, Plaintiffs never moved for a preliminary injunction before the RAD conversion closed. HUD's approval of the conversion was not precluded by a pending application for a preliminary injunction. Plaintiffs' requested relief would have the Court order the rescission of the many financial and property transactions that make up the closed RAD conversion, relief that is altogether different from a court's ordering the escrow of otherwise available funds, as the Court of Appeals did in Savoie.

Plaintiffs are incorrect when they argue that a ruling for HUD would mean it is impossible to challenge a RAD conversion that does not include a waiting period between HUD's approval

and the closing of the conversion. (Pl. Sur-Reply at 8-9.) Plaintiffs were aware of NYCHA's prospective application for a RAD conversion as early as June 2021, roughly eight months before the conversion closed on February 17, 2022. (See dkt. no. 4-12.) Even though agency action must be final before it can be challenged under the APA, (Pl. Sur-Reply at 8-9), and HUD's action became final the same day the conversion closed (Pl. Opp. at 35), before HUD approved the conversion, Plaintiffs could have brought suit and moved for a preliminary injunction or a stay under § 705 of the APA until Plaintiffs' claims against the RAD conversion were adjudicated on the merits. See, e.g., New York v. United States Dep't of Educ., 477 F. Supp. 3d 279, 288, 293-294 (S.D.N.Y. 2020). Plaintiffs' failure to bring their case at the appropriate time does not give them standing to sue now when the conversion has closed and the Court can no longer redress any alleged injuries they may have.

### IV.  Conclusion

For the reasons above, Defendants' motions to dismiss for lack of subject matter jurisdiction are GRANTED. The Clerk of the Court is ordered to close case number 22-CV-2051 and any open motions.

**SO ORDERED.**

Dated:      February 21, 2023
            New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge